412 So.2d 208 (1982)
Deborah Kaye HARDY, et al., Plaintiff-Appellants-Appellees,
v.
STATE of Louisiana, Through DEPARTMENT OF HIGHWAYS, et al., Defendants-Appellees-Appellants.
No. 8662.
Court of Appeal of Louisiana, Third Circuit.
March 17, 1982.
Writ Denied May 7, 1982.
William Doran, Jr., Baton Rouge, for defendants-appellees-appellants.
Troy E. Bain, Shreveport, for plaintiffs-appellants-appellees.
William P. Crews, Jr., Natchitoches, for defendants-appellants.
Bolen & Erwin, James A. Bolen, Jr., Alexandria, Robert L. Salim, Brittain & Williams, Jack O. Brittain, Whitehead & *209 McCoy, Charles R. Whitehead, Jr., Natchitoches, for defendant-appellee.
Thomas & Dunahoe, Gerard F. Thomas, Jr., Natchitoches, for plaintiff-appellee.
Before CULPEPPER, GUIDRY and STOKER, JJ.
STOKER, Judge.
This is a suit for damages brought on behalf of James Donald Campbell resulting from personal injury sustained by him in which his wife Shirley Campbell seeks to be compensated for "mental anguish and the adverse effect on her life caused by the injuries to her husband." The case was heard in the district court in a consolidated trial of cases. After judgment was rendered in the trial court, all cases other than this, the Campbell case, were appealed to this court, the main opinion being reported at 404 So.2d 981 (La.App. 3rd Cir. 1981), writs denied, 407 So.2d 741 (La.1981) on December 14, 1981.
In the trial court all plaintiffs prevailed. Sole liability was imposed on the State through the Department of Transportation and Development. The trial court did not find liability on the part of the City of Natchitoches and its insurer, Hartford Accident and Indemnity Company. We affirmed as to the State and reversed as to the City and Hartford and cast them in solido with the State. As noted in footnote 1 of our opinion in this case, Hardy v. State, Through Dept. of Highways, supra, (404 So.2d 981 at 983), the claim of James D. Campbell and Shirley Campbell did not come up on appeal.[1] The Campbell case was held open for additional evidence relating to Mr. Campbell's physical and medical condition. After this case of the Campbells was completed, the trial court rendered judgment in favor of the City of Natchitoches (without mention of Hartford) denying the demands of both Mr. Campbell and Mrs. Campbell. Judgment was rendered in favor of James D. Campbell (through Shirley D. Campbell as his provisional curator) against the State. All claims of Shirley D. Campbell were rejected. The workmen's compensation claims of Liberty Mutual Insurance Company paid or due to be paid to James D. Campbell were recognized and judgment was rendered in its favor against the State.

APPEALS
This appeal brings up appeals by Shirley D. Campbell (devolutive) and by the State (suspensive). The State specifies only one error: that the court awarded an excessive amount of damages in favor of James D. Campbell. Shirley D. Campbell specifies two errors of the trial court: (1) that the trial court erred in failing to find that the City of Natchitoches had been negligent (and therefore liable to plaintiffs) and (2) the trial court erred in failing to award damages to Shirley D. Campbell for her mental anguish and the devastation of her life.

LIABILITY OF THE CITY OF NATCHITOCHES
For the reasons stated in our opinion in 404 So.2d 981, that portion of the district court's judgment which absolved the City of Natchitoches was error. The City should be cast in judgment in the same manner as in the other cases already decided.

QUANTUM OF THE AWARD TO JAMES D. CAMPBELL
The trial court awarded damages in favor of James D. Campbell in the total amount of $5,251,089.85 consisting of the following: Medical expenses through

March 17, 1981 $ 303,892.61
Future medical expenses 2,568,651.35
Lost wages 55,574.63
Future lost wages 822,971.26
Pain, suffering and disability 1,500,000.00
 _____________
 TOTAL $5,251,089.85

*210 The State and the City do not complain in their briefs or arguments before us on the awards accrued at the time of trial for medical expenses in the amount of $303,892.61 or for lost wages in the amount of $55,574.63. The State's brief, which the City adopts, concentrates its principal attack on the awards for future loss of wages of $822,971.26, for future medical expenses of $2,568,651.35 and the award for general damages of $1,500,000.00. We will confine our review to these last three items of damage.
Damages for Pain, Suffering and Disability.
At the time of his accident Mr. Campbell was 39 years of age. He was married and had a family consisting of two sons who were 15 and 18 years of age. He worked as an automobile salesman for the Natchitoches Motor Company. He suffered a brain stem injury which makes him completely helpless physically, probably affects his mental capacity, causes him to suffer pain from muscle spasms, and affects some of his vital functions.
Initially a tracheotomy had to be performed to assist Mr. Campbell in breathing.
He was taken to the Schumpert Hospital in Shreveport on June 18, 1979, the date of the accident. He remained in intensive care for some 43 days during which time he was unconscious.
On September 4, 1979, Mr. Campbell was discharged to Memorial Hospital in Houston for the purpose of undergoing rehabilitation. He remained in Houston from September 4, 1979, until February 15, 1980. He returned to his home in Provincal, Louisiana, on February 16, and remained there until August 19, 1980. During this period he showed some improvement but his condition worsened in August 1980. He then was returned to Houston on August 19, where he stayed until September 6, 1980. He was at home for three days from September 9 to 10, 1980, and was then returned to Schumpert Hospital where he remained from September 10, 1980, until January 21, 1981. He has been at home since January 21, 1981.
Presently, the prognosis for the future is that there will be no improvement in his present condition. Perhaps the most discouraging and disturbing thing concerning Mr. Campbell's condition is that, although his brain stem injury has rendered him physically helpless, it has apparently not significantly disturbed his ability to see, hear, and understand. He engages in a little or no communication. Occasionally he makes one word responses to questions. He never initiates any conversation.
Mr. Campbell occupies a wheel chair for less than two hours a day but cannot be left alone in a wheel chair as he may slide out of the chair. He can draw his legs up and down but cannot turn himself or change positions. Therefore, nurses are required to turn him and change positions. He cannot change from a prone position to a sitting position. He must be fed by a tube. He cannot assist in any functions such as shaving, brushing his teeth or bathing. He cannot even drink water by himself. He must be fed by a syringe. He has no control over his bladder or bowels. He wears an external catheter for urination and he receives a tap water enema every other day to stimulate his bowels.
During the periods that Mr. Campbell underwent treatment for rehabilitation in Houston he appeared to show some slight signs of improvement. After plateauing in early November of 1979, he showed little improvement thereafter and finally slipped into what is evidently a condition of depression. His physicians and nurses consider that he simply found the mental effort to attempt to cooperate too great, the results too meager and discouraging, and he simply gave up.
That he suffers from frequent pain is evidenced by muscle spasms and other manifestations that make it plain that he is suffering such pain.
After efforts from his initial hospitalization for rehabilitation in Houston which began on September 4, 1979, until January 21, 1981, his condition may be described as having improved slightly and then having steadily regressed. As indicated above, no other improvement is expected and he has *211 been at home under some care since January 21, 1981.
After reviewing Mr. Campbell's residual condition and considering that he would have a life expectancy of 31.6 years, the trial court awarded him for his pain and suffering and disability the sum of $1,500,000.00.
From the description of Mr. Campbell's condition it is evident that no amount of money will have significant meaning for him. He may be able to understand that he is being compensated, but he can do little or nothing with a monetary award to improve his enjoyment of life or ameliorate his lifeless but painful existence. Defendants have cited cases in which claimants with injuries approaching Mr. Campbell's have been awarded sums for their pain, suffering and disability ranging generally between $200,000.00 and $300,000.00. Trahan v. Girard Plumbing & Sprinkler Co., 299 So.2d 835 (La.App. 4th Cir. 1974), writs denied, 302 So.2d 618, 619, 620 (La.1974); Morgan v. Liberty Mutual Insurance Company, 323 So.2d 855 (La.App. 4th Cir. 1975); Carollo v. Wilson, 353 So.2d 249 (La.1977), a Louisiana Supreme Court case in which $1,000,000.00 in damages was reduced to $600,000.00, but which probably represented both general damages and loss of wages; Faulk v. Power Rig Drilling Company, 348 So.2d 219 (La. App. 3rd Cir. 1977), writ dismissed, 350 So.2d 1210 (La.1977), and Hebert v. Missouri Pacific Railroad Company, 366 So.2d 608 (La.App. 3rd Cir. 1978), writ denied, 369 So.2d 153, 155 (La.1979).
In Dupas v. City of New Orleans, 361 So.2d 911 (La.App. 4th Cir. 1978), writ refused, 364 So.2d 121 (La.1978), $50,000.00 was awarded where the plaintiff suffered little initial pain and experienced no residual pain and the court said it was "not disposed to award him (plaintiff) any amount for his alleged loss of cohabitation and companionship of his wife, because the evidence shows that his previous life style was such that he enjoyed no settled family life." In Nichols v. Hodges, 385 So.2d 298 (La.App. 1st Cir. 1980), writ refused, 386 So.2d 355 (La.1980) a trial court award of $750,000.00 in general damages was approved for a plaintiff whose injuries left her with a permanent residual condition somewhat similar to that of Mr. Campbell.
The trial court appears to have approached this highly subjective question on the worth of plaintiff's suffering on a daily basis. In its reasons for judgment the trial court said: "For pain, suffering and disability, Mr. Campbell can expect to live 31.6 years; if awarded $150.00 per day, he would receive $1,730,100.00. If awarded $200.00 per day, he would receive $2,306,800.00."
We do not know whether the trial court was attempting to apply a mathematical formula or simply giving an indication of the value of $1,500,000.00 to Mr. Campbell on a daily basis given his life expectancy. In this particular situation our position is paradoxical. Mr. Campbell is suffering damages of the highest magnitude, but money damages are all that can be awarded to him and money will have little meaning to him. Nevertheless, we must discharge our prescribed duty and consider an award of money in a fair amount. It is our opinion that the trial court abused its discretion in awarding Mr. Campbell the sum of $1,500,000.00. We feel that the highest sum the trial court could have awarded him for pain, suffering and disability is $750,000.00.
Damages for Loss of Future Wages.
The trial court awarded Mr. Campbell the sum of $822,971.26 for future lost wages.
James D. Campbell was thirty nine years old when he was injured on June 18, 1979. He had been employed as a salesman for Natchitoches Motor Company since 1962, a period therefore of approximately seventeen years. His employer testified that Campbell was the best salesman and produced the highest sales volume of any salesman that had worked for him in thirty years. In 1978 Campbell earned $22,814.18. In 1979, through the date of the accident, Campbell earned $12,800.64. Campbell's employer felt that Campbell's earnings would grow steadily because he was continually building a core of satisfied customers who would return to him in the future.
*212 Dr. Luvonia Casperson, who holds a PhD in Economics and is a Professor of Economics at Louisiana State University in Shreveport, projected Mr. Campbell's future medical expenses over his life expectancy of 31.6 years and his future earnings over his work life expectancy of 23.2 years. This expert witness calculated Mr. Campbell's lost wages from the date of the accident to March 31, 1981, to be $55,574.63. On the basis of Mr. Campbell's 1979 earnings up to the date of his accident, Dr. Casperson estimated that Campbell's earnings for the full year would have been $29,083.82. Based on this yearly estimate, Dr. Casperson projected Campbell's future lost wages over the rest of his life expectancy to be $822,971.26. These amounts were awarded to Mr. Campbell by the trial court. In projecting the future wages loss, Dr. Casperson included as factors a 2.8 per cent per year increase for productivity, a 4 per cent increase per year for inflation, and a discount of 5.5 per cent per year. No specific challenge is made by defendants to these awards for lost wages and we do not find that the trial court erred in making them. The State argues that the award to Mr. Campbell is disproportionate to the amount awarded in Morgan v. Liberty Mutual Insurance Company, supra, considering Morgan's earnings and life expectancy as compared to that of Campbell. Such comparisons are not controlling where a trier of fact has before it expert testimony reasonably justifying projections.
The State also urges that:
"... $822,971.26 invested at 6% per year, which is an insurable, safe type of investment, would yield over $49,000.00 per year in interest. This is more than twice the amount Campbell earned per year. Depending on how much was withdrawn from this, the amount could be compounded over the years and the principal never touched."
After carefully considering the testimony of Dr. Casperson, we conclude that the force of the State's argument is more apparent than real. In fact, the figure of $822,971.26 projected by Dr. Casperson contemplates and assumes that the fund will be invested. This amount actually represents a figure which, with addition of investment earnings annually, will yield the necessary funds to compensate Campbell for his lost earnings increased year by year by the inflation factor (4%) and increased productivity factor (2.8%). What the State overlooks is that the sum of $822,971.26 is actually a figure which is fair to both sides. The concept employed is designed to provide probable lost wages each year over the work life expectancy of 23.2 years but in a manner which will exhaust the fund awarded, as annually augmented by investment earnings, at the end of the 23.2 year period.
Our understanding of the methodology of Dr. Casperson may be illustrated by the following discussion. If a straight line projection were to be made of Campbell's income at the time of his injury, ($29,083.82 as found by Dr. Casperson) multiplied by 23.2, the result would be $674,744.62. This is a figure which contains no allowance for annual inflation or increased productivity. Yet, the figure of $674,744.62 is not out of the range of Dr. Casperson's projection of $822,971.26. When one considers that the factors for inflation and increased production would not be uniformly applied to the base wage of $29,083.82, but would be applied each year to the figure for the previous year, which itself had been increased to the extent of 6.8 per cent over the previous year, it becomes obvious that an exceptionally large figure would result. Dr. Casperson does not suggest that such a large amount be awarded. Instead she applies a reducing factor in her discount at the rate of 5.5 per cent per year. By this means Dr. Casperson arrives at what she considers to be the present value of future wages losses.
Dr. Casperson explained the function of the 5.5 per cent annual discount factor as follows:
"Q. Now, explain what discount is and why you used the figure you used of 5.5 percent.
A. We all know if we have a dollar today that we can use it to buy goods and services. A dollar in the future is *213 not worth as much as a dollar is today. We use discounts so that money received in the future can be used today to buy the goods and services.
In other words, if I have $100 today, I can invest that and receive a stream of income for, for example, 23 years. So that at the end of that 23 years the income ... the principal will have been absorbed, as well as the interest.
Q. So the 5.5 percent is so that a person can take his money and put it in the bank and earn interest on it, and since he is doing that he shouldn't get the full amount?
A. Right.
Q. And you have calculated his future lost wages over his work life expectancy using those figures?
A. Yes.
Q. And they came out to be the amount shown on PA-4 as $822,971.26, did they not?
A. Yes, sir."
Considering the explanation of Dr. Casperson and our understanding of the interrelationship of the factors employed (inflation, productivity, and discount) we conclude that there is no merit to the State's conclusion that the principal of the fund of $822,971.26 will never have to be invaded because it will produce over $49,000 per year in interest.
We conclude that the trial court did not err in awarding $822,971.22 in lost wages. While triers of fact are not bound to follow the opinion testimony of expert witnesses,[2] we feel that the trial judge was justified in relying on the testimony of Dr. Casperson as an expert economist. Her inflation factor of 4 per cent per year is far below the present rate of inflation. She stated that her production increase factor of 2.8 per year was based on general experience and the trend over the past twenty-five years. The discount factor of 5.5 is likewise a conservative figure considering interest rates at the present time. Moreover, neither the State nor the City produced expert economists to give testimony in opposition to Dr. Casperson's. Therefore, Dr. Casperson's opinion evidence was the only evidence on the issue of lost wages which the trial court had before it.
Our reason for going to considerable length to explain the fallacy in the State's argument suggesting that the award for lost wages would provide an annual fund in excess of needs, obviating the necessity of invading the principal, is not because the sum of $822,971.26 is inordinate. Numerous cases could be cited to show that this amount is not out of line, given Campbell's life-work expectancy and earnings at the time of his injury. Our motive in dwelling on the matter to some considerable extent is for the reason that an understanding of the method and elements of the economist's projections also apply with respect to the projection for future medical expenses, which projection was fixed by the economist at $2,568,651.35.
Damages for Loss through Future Medical Expenses.
The trial court's award of $2,568,651.35 for future medical expenses is based on an estimated annual cost of $110,000.00 per year. The State and the City do not complain of the use of this estimate which has support in the record in expert testimony. Dr. Casperson testified that the present value of $110,000.00 per year over Mr. Campbell's life expectancy of 31.6 years amounted to $2,568,651.35. In making this calculation, Dr. Casperson employed a 4 per cent inflation rate for medical costs. She then discounted the medical costs at 5.5 per cent annually to obtain the present value.
In view of our discussion of the projection process employed by Dr. Casperson with reference to future lost wages, which was similarly applied with reference to future medical expenses, we find no abuse of discretion on the part of the trial judge in awarding $2,568,651.35 as damages for future medical expenses.
*214 We should emphasize that Dr. Casperson's estimate of Mr. Campbell's expectancy of 31.6 years at age forty is, we presume, based upon experience tables for normal healthy males of that age. (Her estimate of the work life expectancy was taken from U. S. Department of Labor sources.) We have accepted a life expectancy of 31.6 years as the trial court no doubt did, inasmuch as we have found no evidence or medical opinion, and none has been pointed out to us, that Mr. Campbell's life expectancy will be any less than that of a normal, active, healthy human male.[3] Under the circumstances, we are of the opinion that the award should be allowed to stand to cover the full 31.6 years.

THE CLAIM OF SHIRLEY D. CAMPBELL
The trial court rejected the claim of Shirley D. Campbell for mental anguish and the effect on her own life of the tragic consequences of her husband's injury. The trial court assigned as the reason for the rejection the settled rule in Louisiana that, except in death cases, one person may not recover damages for mental pain and anguish suffered by him merely as a result of physical injuries sustained by another person.
The issue has been before our courts many times. Recently, this court again considered the question in Lanham v. Woodward, Wight, & Co., Ltd., 386 So.2d 131 (La.App. 3rd Cir. 1980), writ denied, 392 So.2d 668 (La.1980). With Judge Laborde dissenting, the panel in Lanham adhered to the settled rule. An application for writs was denied, 392 So.2d 668 (La.1980), with Justices Calogero, Dennis and Lemmon voting to grant the writ.
Counsel for Mrs. Campbell concede that the overwhelming authority in this state is against recovery by her. Counsel even cites to us the latest cases following the settled rule from the four circuits which then existed.[4] However, counsel also point out that three of the cases contain criticism of the rule. Counsel state to us that thirty-eight states now permit a wife to recover her damages resulting from loss of consortium. It is our appreciation of the jurisprudence that the Louisiana Supreme Court has never allowed anyone to recover for their own damages for mental anxiety of adverse affect on their lives resulting from injury to a third person. Apparently the Courts of Appeal are following the lead of the Supreme Court. Under the circumstances we regard Louisiana's rule to be fixed despite evident and eloquent dissatisfaction with the rule.[5]
On behalf of Mrs. Campbell it is urged that we should look only to our Civil Code in Article 2315 and ignore the jurisprudence, thus following the lead of Holland v. Buckley, 305 So.2d 113 (La.1974). The ground under consideration has been plowed so frequently and thoroughly without any resulting change that we regard any move in that direction to be up to the Supreme Court of Louisiana or to the Legislature. For these reasons we feel constrained to follow established rule and to affirm the trial court's ruling on this phase of the case.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is affirmed except as to its holding relative to the City of Natchitoches and the amendment relative to the damages awarded to plaintiff James D. Campbell. As to the City of Natchitoches, the judgment *215 of the trial court is reversed and it is cast in judgment in solido with the State of Louisiana, Department of Transportation and Development, and the trial court judgment is amended accordingly. The trial court judgment is further amended to reduce the total judgment in favor of Shirley D. Campbell, as provisional curator of James D. Campbell, of $5,251,089.85 by the sum of $750,000.00, so as to award on his behalf a total of $4,501,089.85, subject to the deduction mentioned in the trial court's judgment.
In affirming the trial court's judgment except as indicated we also confirm that portion of the judgment which recognizes the rights of Liberty Mutual Insurance Company for the recovery of amounts paid in workmen's compensation benefits and medical benefits and for credits against future obligations which may be incurred in favor of James D. Campbell under the workmen's compensation law, such recovery, however, to be effective only out of such portion of plaintiff's recovery as may be paid by the State inasmuch as no appeal was taken by Liberty Mutual Insurance Company from the trial court's judgment rejecting all demands of the City of Natchitoches.
AMENDED AND AFFIRMED AS AMENDED.
NOTES
[1] The claims of James D. Campbell and Shirley Campbell were asserted through intervention in the Hardy suit. Consequently, the case carries the same caption as the Hardy suit, i.e., Deborah Kaye Hardy v. State of Louisiana, through Department of Highways, et al. That case, reported at 404 So.2d 981, bears our number 8276, whereas this case of the Campbells bears our number 8662.
[2] Smith v. Andrepont, 378 So.2d 479 (La.App. 1st Cir. 1979); Pierre v. Landry, 341 So.2d 891 (La.1977); Payne v. New Orleans Public Service, 374 So.2d 189 (La.App. 4th Cir. 1979), and Gleason v. City of Shreveport, 393 So.2d 827 (La.App. 2nd Cir. 1981).
[3] Dr. Cecil C. Dopson, Jr., a psychiatrist, gave the only testimony we have found concerning whether Mr. Campbell's condition might lessen his life expectancy below what would be normal. He admitted that such a result was possible, but stopped short of even stating a probability.
[4] Waldrop v. Vistron Corp., 391 So.2d 1274 (La.App. 1st Cir. 1980), writ denied, 394 So.2d 281 (La.1980); Lanham v. Woodward, Wight & Co., Ltd., supra; Brauninger v. Ducote, 381 So.2d 1246 (La.App. 4th Cir. 1979) and Parker v. St. Paul Fire & Marine Ins. Co., 335 So.2d 725 (La.App. 2nd Cir. 1976), writ refused, 338 So.2d 700 (La.1976).
[5] The writer of this opinion joins those who have expressed themselves as believing that a re-examination of the rule should be made at the appropriate level.