467 So.2d 584 (1985)
Julius Carnell HATCHER, Plaintiff-Appellee,
v.
STATE of Louisiana, THROUGH the DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, Defendant-Appellant.
No. 84-222.
Court of Appeal of Louisiana, Third Circuit.
March 14, 1985.
Rehearing Denied April 17, 1985.
*586 Lawrence A. Durant, Baton Rouge, Jeansonne, Briney & Goudelocke, John A. Jeansonne, Lafayette, for defendant-appellant.
Ronald E. Dauterive, F. Ray Mouton, Lafayette, for plaintiff-appellee.
Before DOUCET, LaBORDE and YELVERTON, JJ.
LaBORDE, Judge.
Defendant State of Louisiana, Department of Transportation and Development (DOTD) appeals from a judgment finding it liable for damages sustained by plaintiff Julius Carnell Hatcher as a result of an intersectional collision. Hatcher answers and requests that the amount of the judgment against DOTD be increased. We find no error. We affirm.
The intersection involved in this automobile collision case is the junction of Highway 167 and Creswell Lane in St. Landry Parish, near Opelousas. Highway 167 is a relatively heavily traveled north-south road, consisting of four lanes at the accident location, maintained by DOTD. Creswell Lane is a minor road that runs east-west and primarily serves local residents.
This intersection has a startling history of accidents. Apparently, most of the accidents have been caused by the failure of Creswell Lane traffic to stop and to yield the right-of-way to Highway 167 traffic. Therefore, a disproportionate number of the total amount of accidents at this intersection have been right angle collisions. This intersection, from its initial construction in the early 1960s until plaintiff's accident in 1978, was known by the officers of Troop K of the Louisiana State Police to have the largest yearly number of accidents of any intersection within their jurisdiction, making it the most dangerous intersection in Avoyelles, St. Landry, Pointe Coupee, and Evangeline Parishes. Various elected officials and civic groups had voiced complaints about the intersection over the last two decades. In response to some of these complaints, in 1972, DOTD installed flashing red signals, in addition to stop signs, facing Creswell Lane traffic, and flashing yellow signals facing Highway 167 traffic. However, the accident rate continued to increase at the intersection.
In late 1977, DOTD began construction of an overpass at the intersection. Since completion of the overpass (after the accident involved in this case), right angle collisions have, of course, been eliminated at the intersection.
Hatcher's accident occurred on February 14, 1978. At that time, construction on the overpass was in full progress, and work crews were present at the site when the accident occurred. Testimony at trial and photographs taken shortly after the accident indicate that mounds of fill dirt and items of heavy equipment interfered with visibility on the day of the accident. The construction work, however, did not eliminate passage through the intersection and over contiguous sections of Highway 167 and Creswell Lane. No flagmen were used and the only traffic signals at the intersection were the flashing beacons mentioned previously, even though the general contractor had requested that DOTD place a stop-go traffic light at the intersection for safety purposes during the construction.
Hatcher was proceeding south on Highway 167 in his pick-up truck. Madelon Bowman was traveling west on Creswell Lane in her car. She claims to have completely stopped at the intersection before attempting to cross Highway 167, and she claims that she did not see any traffic on Highway 167. Whether or not she came to a complete stop, her vision apparently was blocked in certain areas by the fill dirt and the machinery. Bowman then entered the intersection, and her car collided with Hatcher's truck. Hatcher's truck flipped over several times, and finally came to rest against a third vehicle. Hatcher was thrown from his truck during the accident. Hatcher was seriously injured, and is now an irreversible quadriplegic.
*587 Numerous private parties with potential liability for his injuries were sued by Hatcher. Hatcher also sued DOTD, which is an organ of state government. Hatcher's suit against DOTD resulted in a $2,688,165 award for plaintiff. The demands against private parties were tried to a jury, but Hatcher's claim against DOTD was tried solely to the trial judge. Only the judgment against DOTD is before this court on appeal.
DOTD claims that the trial judge erred in the following respects:
(1) The trial judge erred by finding that a stop-go signal at the intersection probably would have prevented the accident, and that DOTD was negligent in not installing a stop-go signal under the circumstances.
(2) The trial judge erred by finding that plaintiff was not contributorily negligent.
(3) The trial judge erred by dismissing DOTD's third party claims.
(4) The trial judge abused his discretion by awarding an unreasonably high amount in damages.
Hatcher presents one issue for the consideration of this court. Hatcher contends that the amount of damages set by the district judge is unreasonably low and an abuse of discretion, and that this court should increase the award.
We will now consider the issues in the order presented.[1]

LIABILITY OF DOTD
The trial judge issued an extensive and well-reasoned opinion that sets forth his findings of fact and conclusions of law. The judge expressly based the liability of DOTD on its failure to moniter the intersection properly and its consequent failure to install a stop-go signal, which he found to be a proximate cause of Hatcher's injuries. The judge expressly declined to rule on DOTD's potential liability based on other alleged negligent acts and omissions, and he further decided that it was unnecessary to consider alternative theories of liability argued by Hatcher, including strict liability under Civil Code article 2317 and a theory of strict liability derived from DeBattista v. Argonaut-Southwest Ins. Co., 403 So.2d 26 (La.1981). Because the trial judge premised DOTD's liability on a legal theory we find sound, and because that theory is applied to factual conclusions supported by the record, we also find no need to consider and therefore decline to address alternative theories of liability.
The case, as decided by the trial judge, involves provisions of the Manual of Uniform Control Devices. The manual is a handbook for signals and other traffic control devices, modeled after the guidelines employed by the Federal Highway Administration of the United States Department of Transportation. The use of the manual by DOTD is mandated by LSA-R.S. 32:235(A).
Compliance with the provisions of the manual is prima facie proof of a road authority's absence of fault when an injured motorist attempts to predicate the liability of the road authority on improper signalization or road marking. LSA-R.S. 32:235(E). However, noncompliance with the manual is not negligence per se, Harkins v. State, Dept. of Highways, 247 So.2d 644, 648 (La.App. 3d Cir.), writ denied, 259 La. 741, 252 So.2d 449 (1971), rather, the injured motorist, in order to recover from the road authority, must prove that the authority acted unreasonably under the circumstances. See McCoy v. Franklin Parish Police Jury, 414 So.2d 1369, 1372 (La. App. 2nd Cir.1982); Hodges v. State, Through Dept. of Highways, 370 So.2d 1274, 1278 (La.App.3d Cir.), writs denied, 374 So.2d 660, 661 (La.1979); Bernhard v. Campbell, 303 So.2d 884, 887 (La.App. 1st Cir.1974).
*588 The trial judge found that DOTD acted unreasonably under the circumstances. He noted that certain requirements, termed "warrants," are set forth in the manual as reasons to install certain forms of signalization or marking on public roadways. Eight warrants that pertain to stop-go signals are included in the manual. The judge focused upon warrants 6 and 2.
 Warrant 2 provides:
 "The Interruption of Continuous Traffic warrant applies to operating conditions
where the traffic volume on a major street is so heavy that traffic on a minor
intersecting street suffers excessive delay or hazard in entering or crossing the major
street. The warrant is satisfied when, for each of any 8 hours of an average day, the
traffic volumes given in the table below exist on the major street and on the highervolume
minor-street approach to the intersection, and the signal installation will not
seriously disrupt progressive traffic flow.
 MINIMUM VEHICULAR VOLUMES
 FOR WARRANT 2
Number of lanes for moving Vehicles per hour on
traffic on each approach Vehicles per hr. on higher-volume minor
 major street (total street approach (one
Major Street Minor Street of both approaches direction only)
1 ___________ 1 ___________ 750 75
2 or more ___ 1 ___________ 900 75
2 or more ___ 2 or more 900 100
1 ___________ 2 or more 750 100
These major-street and minor-street volumes are for the same 8 hours. During
those 8 hours, the direction of higher volume on the minor street may be on one
approach during some hours and on the opposite approach during other hours.
 When the 85-percentile speed of major-street traffic exceeds 40 miles per hour, or
when the intersection lies within the built-up area of an isolated community having a
population of less than 10,000, the interruption of continuous traffic warrant is 70
percent of the requirements above (in recognition of differences in the nature and
operational characteristics of traffic in urban and rural environments and smaller
municipalities)."
 Warrant 6 provides:
 "The Accident Experience warrant is satisfied when:
 1. Adequate trial of less restrictive remedies with satisfactory observance and
enforcement has failed to reduce the accident frequency; and
 2. Five or more reported accidents, of types susceptible of correction by traffic
signal control, have occurred within a 12-month period, each accident involving
personal injury or property damage to an apparent extent of $100 or more; and
 3. There exists a volume of vehicular and pedestrian traffic not less than 80
percent of the requirements specified either in the minimum vehicular volume
warrant, the interruption of continuous traffic warrant, or the minimum pedestrian
volume warrant; and
 4. The signal installation will not seriously disrupt progressive traffic flow.
 Any traffic signal installed solely on the Accident Experience warrant should be
semi-traffic-actuated (with control devices which provide proper coordination if
installed at an intersection within a coordinated system) and normally should be fully
traffic-actuated if installed at an isolated intersection."
The trial judge noted that DOTD had made only one complete traffic study at the intersection, and that that survey was conducted in 1967. According to the study, the 85-percentile speed of Highway 167 traffic was 65.9 m.p.h. Although the speed *589 limit on that portion of Highway 167 was 70 m.p.h. in 1967, the judge concluded, based on the evidence, that even with a reduced speed limit of 55 m.p.h., the 85-percentile speed on Highway 167 "must have been considerably over 40 miles per hour as provided in warrant 2."
The judge applied the 85-percentile speed reduction under warrant 2 to the traffic volume requirements of that warrant, and correctly concluded that the threshold requirements would be lowered to 70 percent of 900 for Highway 167, or 630 vehicles per hour counting traffic in both directions, and to 70 percent of 100 for Creswell Lane, or 70 vehicles per hour in one direction only. The 1967 study, based on a four-hour average, not the eight hours required, found 619 vehicles per hour on Highway 167 and at least 35.5 vehicles per hour in one direction on Creswell Lane.[2] The judge therefore noted that, between 1967 and sometime prior to 1978, an increase from 619 to 630 vehicles per hour would have met the warrant 2 requirement for Highway 167. On the basis of the lay and expert evidence, and his own common sense and knowledge, he extrapolated that this increase, at least, had certainly occurred, which is an emminently reasonable conclusion, given the general increase in population and traffic volume in Louisiana, particularly in this part of the state. The judge also concluded that between the time of the study and sometime well before the accident, one direction traffic volume on Creswell Lane must have topped the warrant 2 requirement, based on the same considerations as those applied to Highway 167 traffic, plus the new developments of residential areas that necessarily increase traffic volume on this type of street. The judge noted that the accident rate at the intersection had increased 345 percent as measured from the five year average of the 1967 study to a three year average for the years immediately prior to the accident. "With such an increase, there must have been at least such increase in the vehicle volume that Warrants 6 and 2 were met."
As for warrant 6, the judge noted that the third requirement was the only one arguably not met, even in 1967. He noted that the 80 percent volume requirement of warrant 6 applied to the volume values of warrant 2 (already reduced to 70 percent of original value by warrant 2 itself) yields a necessary traffic volume of 504 vehicles per hour on Highway 167, and 56 vehicles per hour in one direction on Creswell Lane. The judge correctly concluded that Highway 167 traffic volume met the warrant 6 requirement even in 1967, and that an increase from 35.5 to 56 vehicles in one direction per hour almost certainly had occurred on Creswell Lane. Again, the same common sense observations, based on evidence presented at trial, convinced the judge that warrant 6 had been met by the intersection for at least several years prior to the accident. He further observed that "[i]f there were not [sufficient traffic volume increases], the rising accident rate without consequent vehicle-volume increase would have been so alarming as to dictate installation of a stop-go signal."
The trial judge heard expert testimony on whether the stop-go signal warrants had been met from two defense witnesses and one witness for plaintiff. The judge discounted the defense witnesses' testimony because it was based on the out-of-date 1967 study. The judge's interpretation of the data is in substantial agreement with that of plaintiff's expert. The judge correctly concluded that the defense experts' opinions were flawed, because they were based on outmoded data. Further, it is distinctly within the province of the trial fact-finder (here, the trial judge) to assess the credibility of expert witnesses and the weight to be assigned to their testimony. See, e.g., Acadian Heritage Realty v. City *590 of Lafayette, 434 So.2d 182, 189 (La.App.3d Cir.), writ denied, 440 So.2d 733 (La.1983); Smith v. Lumbermen's Mut. Cas. Co., 414 So.2d 1281, 1283 (La.App.3d Cir.), writ denied, 417 So.2d 367 (La.1982). The evaluation of and conclusions drawn from competing expert testimony will not be disturbed on appeal in the absence of manifest error. Smith, 414 So.2d at 1283. The trial judge's conclusions were not clearly wrong; to the contrary, they appear to be clearly correct and to surpass extensively the standard mandated for our appellate review of such factual issues.
The trial judge correctly opined that the warrants in the manual do not set absolute legal standards for DOTD that mandate installment of a control device if the warrant requirements are met, nor is DOTD absolutely prohibited from installing a device if warrant requirements are not met; rather, the manual, which must be adopted and used by DOTD, provides extremely persuasive guidelines for the road authority. See Harkins, 247 So.2d at 648. The judge noted that no complete traffic surveys were conducted at the intersection after 1967. In 1972, in response to continued complaints, DOTD did conduct an observation of some sort at the intersection, but the only conclusion of this observation was that Creswell Lane motorists were not obeying the stop sign. Shortly thereafter, the flashing yellow and red signals referred to previously were installed. The manual requires extensive engineering surveys for traffic signalization projects, and periodic checks of problem areas. The judge further noted that, in light of the volume and frequency of complaints received by DOTD in regard to the intersection, and its tragic accident history, DOTD at least should have monitered the intersection more closely. The judge was convinced that monitering the intersection would have shown that stop-go signal warrants were met, and also would have shown, beyond the manual specifications, that a stop-go signal was patently necessary for safety purposes. We agree. The judge concluded:
"In a way of viewing it, the Department's basic negligence was in [sic] failure to properly monitor the intersection. This led to an absence of a signal which would have been in place at the intersection prior to the accident. The Department is responsible for its failure to monitor and the necessary consequence of that failurethe absence of a stop-go signal."
The judge also found, as a fact, that the absent stop-go signal probably would have prevented the accident:
"Mr. Harry [defendant's expert] repeatedly expressed the view that the Creswell motorists were aware of the stop condition but did not obey the stop signs and flashers. They entered U.S. 167 without a deliberate observation for traffic on U.S. 167. This is precisely what the stop-go signal would have prevented. Many motorists will run, or make only a rolling stop, at a sign or flasher. Very few motorists will not fully stop at a stop-go signal. Once the motorist stops for a signal, misobservation or human error is almost completely eliminated. Thus, a stop-go light would have probably brought Mrs. Bowman to a full stop if she did not in fact do so. Once fully stopped, she would not have entered except on greenwhen U.S. 167 traffic was facing a red light and under control. If the light facing Madelon Bowman had been green originally, she would have entered U.S. 167 without a problem. A stop-go signal at the intersection would have avoided the tragic collision."
This factual conclusion, based on a common sense evaluation of the evidence, is not clearly wrong. It should not be disturbed on appeal. See Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978).
DOTD argues that, because it is an administrative agency of state government, it cannot be held liable for its "mere" negligence in failing to install a stop-go signal. DOTD states that its decisions as to whether or not stop-go signals will be installed are administrative decisions. DOTD argues *591 that the familiar principle of administrative lawwhether an action or decision is arbitrary and capricious or, instead, whether the action or decision is a rational exercise of administrative powershould have been applied to its decision not to install a stop-go signal. Assuming, arguendo, that the trial judge should have applied the arbitrary and capricious standard, DOTD begs the question by framing, as the action to be questioned by the trial judge, its decision not to install a stop-go signal. As noted above, the trial judge ultimately premised liability on DOTD's failure to take even the most basic, necessary investigative steps to begin a determination as to whether a stop-go signal was needed at the intersection. Clearly, no rational "decision" was ever made by DOTD; thus, even measured by the arbitrary and capricious rule, the actions of DOTD fall below the standard.
At a more basic level, however, administrative law principles are simply inapplicable to the present matter. The arbitrary and capricious standard applies to action taken by an administrative body functioning as a quasi-judicial forum or rule-making entity. A person who is directly aggrieved by a quasi-judicial decision of or rule promulgated by an administrative body may have the right to seek review in a court of law, and the court then must determine whether the administrative body acted rationally and within the framework of its enabling and governing legislation, or whether the administrative body acted arbitrarily and capriciously. See La. Rev.Stat. 49:964 (judicial review provision of Louisiana Administrative Procedure Act); see also Bowman v. Office of Employment Security, 403 So.2d 825 (La. App.2d Cir.1981) (reviewing decision by state board denying claimant unemployment compensation); Cannatella v. City Civil Serv. Comm'n, 381 So.2d 1278 (La. App. 4th Cir.), writ denied, 384 So.2d 793 (La.1980) (whether rating scale adopted by civil service commission for police officer promotions was arbitrary and capricious); cf. 5 U.S.C. sec. 706(2) (1976) (judicial review provision of U.S. Administrative Procedure Act analagous to Louisiana's review provision); see generally Verkuil, Congressional Limitations on Judicial Review of Rules, 57 Tul.L.Rev. 733 (1983); Cutler & Johnson, Regulation and the Political Process, 84 Yale L.J. 1395 (1975). In the present matter, plaintiff did not appeal to the district court an agency rule or quasi-judicial decision. Rather, plaintiff asserted his right to sue DOTD under principles of law applicable to that agency and all other public and private entities and persons in this state.
The finding of liability for negligence on the part of DOTD is in accord with similar cases that rest on this authority's duty to provide safe highways to motorists. See, e.g., Hodges v. State, Through Dept. of Highways, 370 So.2d 1274 (La.App.3d Cir.), writs denied, 374 So.2d 660, 661 (La.1979); Ardoin v. State, Dept. of Highways, 333 So.2d 412 (La. App.3d Cir.), writs denied, 337 So.2d 214, 528 (La.1976). Under the duty/risk analysis employed in negligence cases based on Civil Code articles 2315 and 2316, it is clear that the traveling public is that class of persons to whom DOTD owes a duty to provide safe highways, and it is equally as clear that the risk reasonably to be perceived from the breach of that duty is exactly the risk that materialized in this matter: the risk of collision. DOTD did not take reasonable steps to minimize this risk. DOTD is therefore liable for damages caused to Hatcher by its negligent failure to take appropriate steps to prevent the circumstances that caused the accident.

CONTRIBUTORY NEGLIGENCE
DOTD contends that the trial judge erred by concluding that Hatcher was free from negligence which contributed to the causation of the accident. The trial judge found as follows:
"There is not sufficient showing to conclude plaintiff was negligent. The only specific acts of contributory negligence of which he could have been guilty were excessive speed and failure of lookout. *592 I discount entirely his testimony concerning the events immediately preceding the collision; this is because the serious injuries he had must have substantially affected his memory.
There was no evidence that he was speeding. There is nothing on which to determine failure of lookout unless it would be a conclusion that Madelon Bowman speeded into the intersection without giving any indication, while on Creswell, that she would honor plaintiff's right of way. Such a conclusion is not permissible. The tests were not conclusive. The testimony was conflicting. I believe even those who claim she ran the light did not distinguish between a full stop and a rolling one. This latter also would have caused plaintiff to proceed into the intersection at a time of danger which could not be known.
The burden is on defendant; it has not been met."
The testimony of plaintiff referred to by the trial judge is his failure to recall the events immediately preceding the collision. The trial judge, as fact-finder, is given wide discretion to evaluate the weight and credibility of testimony, and to draw factual conclusions from the evidence presented. In the absence of manifest error, otherwise stated as a factual conclusion that can be characterized as "clearly wrong" based on the record as a whole, an appellate court should not disturb such findings of fact. Arceneaux, 365 So.2d at 1333. The trial judge was not clearly wrong in concluding that Hatcher was not contributorily negligent. Further, the proper legal standard for contributory negligence in cases of this nature was applied by the trial judge. See McCoy, 414 So.2d at 1374-75; Hodges, 370 So.2d at 1278-79.

DOTD's THIRD PARTY CLAIMS
In this case, the trial judge entered an initial ruling that DOTD was not liable to Hatcher, and as a consequence of this ruling, DOTD's claims against third parties were dismissed. Subsequently, after reviewing the law and all the evidence presented in the complex, lengthy trial of this matter, the trial judge reversed himself and entered the judgment against DOTD that is before this court today. No mention is made of DOTD's third party claims in the final judgment of the trial court, and DOTD inquires as to the status of its previously dismissed third party claims.
We question the propriety of adjudicating DOTD's third party demands in this appeal. DOTD did not appeal the dismissals of its third party claims; the only judgment that DOTD appeals to this court is Hatcher's judgment against it. More importantly, the only parties to this appeal are Hatcher and DOTD. We cannot render a judgment either against or in favor of parties who are not parties to this appeal. See, e.g., Gremillion v. Goleman, 316 So.2d 810, 818 (La.App. 1st Cir.1975). No party subject to DOTD's third party claims has been brought before this court. This court's remedial powers under Louisiana Code of Civil Procedure article 2164 are broad, but this court does not have the power to join, sua sponte, additional parties to an appeal. It is DOTD's responsibility to bring its third party defendants before this court, and DOTD has failed to do so.
If we ruled on DOTD's third party claims, we would be issuing an advisory opinion that would not bind DOTD's erstwhile third party defendants. Our adjudication would lack the necessary presence of adverse parties, all of whom would be bound as a matter of res judicata by our decision. The sharply drawn focus on the issues provided by the adversary system is lacking when the representatives of only one side of a dispute are before a court and will be bound by its decision. For these reasons, DOTD's third party claims will not be adjudicated in this appeal. See Louisiana Independent Auto Dealers Ass'n v. State, 295 So.2d 796, 799-801 (La.1974).
Although we do not rule on the merits of DOTD's third party claims, we may, without subverting our role as a resolver of *593 concrete, adversarial disputes, offer the following limited answer to DOTD's query: DOTD's third party claims are not barred merely because they are not considered in this appeal. DOTD may still pursue its third party claims through whatever action is otherwise legally permissible; DOTD's legal rights (if any) to third party relief are wholly unaffected by today's decision.

QUANTUM
DOTD contends that the trial judge's award for damages is unreasonably high; conversely, Hatcher contends that the award for damages is unreasonably low. Hatcher cites, in support of his contention, Hardy v. State, Through Dept. of Highways, 412 So.2d 208 (La.App.3d Cir.), writs denied, 414 So.2d 305, 381 (La.1982). Hatcher argues that his total award of $2,688,165 is unreasonably low in comparison to the $4,501,089.85 recovered by the similarly situated plaintiff in Hardy. Hatcher and the Hardy plaintiff were both in their late thirties, and both were rendered quadriplegic by automobile accidents. Plaintiff in Hardy also sustained brain damage, but Hatcher's accident has not impaired his mental capability and awareness. DOTD, also citing Hardy as authority, focuses on the award for pain and suffering in this case. DOTD contends that pain and suffering damages in this case are unreasonably high compared to the $750,000 pain and suffering award for the similarly situated Hardy plaintiff.
The trial judge in this case set damages as follows:

Mental and physical pain and anguish endured
 and to be endured for remainder of life ........$1,250,000.00
Medical to date of trial ........................ 257,265.00
Lost wages ...................................... 328,000.00
Medical care in the future ...................... 793,000.00
Drugs ........................................... 40,000.00
Van ............................................. 13,000.00
Wheelchair ...................................... 6,900.00
 _____________
 $2,688,165.00

In regard to pain and suffering, the judge noted that the Hardy plaintiff received $750,000. He explained the larger award entered in this case:
"For physical and mental pain and anguish for duration of life, I will allow $1,250,000. This figure is determined to a great degree by using the Hardy case allowance as a guide or starting point. I adjust upward for the facts (1) that this plaintiff experienced much more pain in the first several months after the accident and was more aware of that pain, (2) that he is more cognizant of his handicap and the future which lies ahead of him and (3) that he can be helped by money much more than could the plaintiff in the Hardy case."
The award of past medical expenses was based on undisputed figures. The other elements of the total award were based on the trial judge's assessment of expert testimony as to the future earning capacity of plaintiff, plaintiff's life and work life expectancy, projected costs of future health care, and the effect of future inflation.
The general rule of appellate review of damage awards in this jurisdiction is that the amount awarded at trial will not be altered on appeal in the absence of an abuse of discretion by the award setter, be it judge or jury. Reck v. Stevens, 373 So.2d 498, 500 (La.1979). Similar cases are useful when it can be illustrated that the trial award is the result of abused discretion, but the primary aim of damage awards is to provide proper compensation for the discrete plaintiff, and disparate total awards in facially similar cases is not cause for reversal if the disputed award is justified under the facts of the individual case. See id.
In the context of an award for pain and suffering, extremely great leeway must be granted to the trial fact-finder, who has been afforded the best opportunity to observe first-hand the evidence showing plaintiff's anguish and agony, and the prospect of continued pain and suffering. It is extremely difficult to place an exact dollar value on this aspect of an award. We find that the trial judge did not abuse his discretion by awarding $1,250,000 for pain and suffering, both past and prospective. The other elements of the damage award are capable of a more exact determination, though the amount necessarily is still *594 somewhat speculative as to compensation for future losses and expenses. Accordingly, the discretion of the trial fact-finder is reduced to some extent. Compensation for lost future income, for example, must be based on a reasonable evaluation of the individual's earning potential and work life expectancy, and the discount applied to the lump-sum award that replaces lost future income must realistically reflect the effect of projected future long-term inflation on that type of secure, moderate-yield investment in which the lump-sum award ostensibly will be placed. However, in this instance, all calculations by the trial judge as to future expenses, lost wages, inflation, etc., were based on competent, reasonable expert testimony presented at trial, and the actual amount of each damages element awarded to plaintiff is within the range of estimates offered by the experts. Under these circumstances, there is no abuse of discretion.

CONCLUSION
Based on the above reasons, the judgment of the district court is affirmed. Each party appealed, and each party is assessed with its own costs on appeal.
AFFIRMED.
YELVERTON, J., concurs in part and dissents in part, and assigns written reasons.
YELVERTON, Judge, concurring and dissenting.
I agree with this opinion except for the handling of DOTD's third party demands. The majority is mistaken in saying DOTD did not appeal the dismissals of its third party demands. DOTD's motion for appeal in the record expressly stated that it was aggrieved by and wished to appeal from both Hatcher's judgment against it and the dismissal of its third party demands, all rulings being couched in the same judgment, and the order of appeal granted it a suspensive appeal from that judgment.
It is also incorrect to say that no mention is made of DOTD's third party claims in the final judgment of the trial court. The first judgment dismissed Hatcher's demand against DOTD, and also all of DOTD's third party demands. After a new trial, an amending judgment was signed, the Court reversing itself and granting Hatcher a judgment against DOTD, but the amending judgment declared that "in all other respects the judgment [meaning the first judgment] remains unchanged." This means that there was a final judgment dismissing the third party demands. It is from that judgment that DOTD appealed, expressly stating in its motion for appeal that it was aggrieved by the dismissal of the third party demands and wished to appeal therefrom. Let us suppose, however, that the judgment was silent as to the third party demand against Mrs. Bowman and her insurer. We are then required to consider that silence as a rejection of the demand. Reed v. Seacoast Products, Inc., 458 So.2d 971 (La.App. 3rd Cir.1984). Either way the final judgment is construed, DOTD lost its third party demands, and appears before us appealing the rejection of those third party demands.
One of the third party demands that was dismissed was DOTD's demand against Mrs. Bowman and her insurer for contribution. Since Mrs. Bowman and her insurer were third party defendants in this case, and since the judgment appealed from rejected DOTD's third party demands, and since it has appealed the judgment rejecting those demands, I cannot see how it can be said that the only parties to this appeal are Hatcher and DOTD.
This is a complex case, and it has some unusual procedural complexities. Because there was no appeal by either side from Hatcher's judgment against Mrs. Bowman and her insurer, it is easy to jump to the conclusion that Mrs. Hatcher and her insurer are not before us on this appeal. But this means only that Mrs. Bowman and her insurer are not before us in their capacity as defendants in the main demand. They are, however, before us in their capacity as defendants in the third party demand by DOTD.
*595 It might be unnecessary for us to consider the third party demands made by DOTD against the contractor and its insurer, because the jury finding that the contractor was not negligent eliminates the basis for a third party demand against the contractor based on contribution as between joint obligors. The rejection of that third party demand was clearly right; so clear, in fact, that perhaps it does not merit discussion. The rejection of the third party demand against Mrs. Bowman and her insurer, however, was clearly wrong. The plaintiff alleged in his petition that the State and Mrs. Bowman were joint-tortfeasors and liable in solido, the jury found Mrs. Bowman negligent in causing the accident, and the trial judge found the State negligent; therefore, their concurrent negligence caused the accident. The State filed a third party demand to enforce its right to contribution as required by C.C. art. 1805 (formerly C.C. art. 2103). The third party demand should have been granted.
The appeal of this third party demand cannot simply be shunted aside as raising no important issues. Important issues are present. For example, DOTD argues that at least it ought to get credit for $196,666 paid by Mrs. Bowman's insurer after judgment was rendered in this case. Our judgment, when final, leaves DOTD without judicial recognition of the solidary nature of the obligation as between it and Mrs. Bowman, and without a judgment against Mrs. Bowman on its third party demand. What will happen if DOTD later claims credit for the $196,666?
The third party demand against Mrs. Bowman and her insurer should be granted and we should amend the judgment in that respect.
NOTES
[1] DOTD has filed two briefs in this case: an original brief filed on April 2, 1984, and a supplemental brief filed on January 30, 1985. We have consolidated the issues and assignments of error presented by DOTD's two briefs into the issues set forth above and discussed in our opinion.
[2] The 1967 study provides data for the traffic volume traveling Creswell Lane in both directions only; separate volume figures for each approach are not provided. By splitting the average of 71 vehicles per hour, the trial judge used the most conservative estimate possible, because it is extremely likely that the hourly traffic flow was heavier in one direction or the other.