Sally  FIRESTONE,
Plaintiff-Respondent,

v.

CROWN  CENTER  REDEVELOPMENT
CORPORATION,  et  al.,
Defendants-Appellants.

No. 66840.

Supreme Court of Missouri,
En Banc.

June 25, 1985.

Rehearing Denied Aug. 7, 1985.

Robert L. Driscoll, John C. Aisenberry, Terence J. Thum, Catherine M. Hauber, Michael E. Waldeck, Thomas B. Alleman, Kansas City, for defendants-appellants.

Lantz Welch, Timothy L. Brake, James Bartimus, Kansas City, for plaintiff-respondent.

HIGGINS, Judge.

Plaintiff obtained a jury verdict of $15,-000,000 damages for injuries suffered when suspended balconies in the Hyatt Regency Kansas City Hotel fell on July 17, 1981. The trial court entered an order granting defendants a new trial unless plaintiff filed a remittitur of $2,250,000 "because the verdict is against the weight of the evidence." Plaintiff filed the required remittitur and the court entered judgment for plaintiff for $12,750,000. Defendants appealed and, in addition to asserting trial errors, claimed the damage award as reduced by remittitur was still excessive. They requested reversal and remand for new trial or alternatively that the verdict be reduced by further remittitur to $7,500,000. Plaintiff responded to the alleged trial errors and under Rule 78.10 requested restoration of the $2,250,000 remittitur required of plaintiff by the trial court as a condition to denial of a new trial to defendants. The Court of Appeals, Western District, affirmed the judgment and transferred the case to this Court where it is determined the same as on original appeal.

This Court affirms the jury's verdict in all respects and remands the cause with directions to set aside the order of remittitur, reinstate the verdict and enter judgment for plaintiff for the verdict sum of $15,000,000.

This Court further determines that this case demonstrates that the doctrine of remittitur should be abolished in Missouri.

This Court draws freely from the opinion written by the Honorable Don W. Kennedy for the court of appeals in resolution of the alleged trial errors.

I

■ Appellants assert that the trial court erred in denying their application for a change of venue. The publicity surrounding the tragic collapse of the Hyatt Regency skyways, causing the deaths of 114 people and severe injuries to scores of others; the pretrial publicity about plaintiff's case; and publicity about the lawsuits of three other Hyatt Regency victims which had been tried in the three months preceding plaintiff's case, had, according to defendants' argument, caused the residents of Jackson County to be prejudiced against defendants so that they could not receive a fair trial there.

The granting of a change of venue in Jackson County, a county of over 75,000 population, is discretionary with the trial court, Rule 51.04, subject to review for abuse of discretion. *Neal v. Kansas City Ry.*, 229 S.W. 215, 216–18 (Mo.1921).

In an evidentiary hearing upon defendant's application, the defendants produced evidence of newspaper and television publicity about the Hyatt Regency disaster and the ensuing litigation over a period beginning with the disaster itself and continuing up to the time of trial. The Kansas City Star and the Kansas City Times, reaching half the households of Jackson County on a daily basis, published over 1,000 articles on the subject. The television coverage was no less intense.

The news media featured stories about the purported causes of the collapse, and the persons responsible. Another favorite topic was possible criminal penalties and disciplinary proceedings against persons participating in the design and construction of the hotel. There were newspaper articles and television pieces reporting on the commencement of investigations by the Jackson County Prosecutor, the U.S. District Attorney, a Jackson County Grand Jury, and the Missouri board licensing architects and engineers. Also reported and highlighted after the commencement of litigation were allegations (from whatever source) of misconduct on the part of defendants and their counsel in the conduct of litigation.

Publicity, even adverse publicity, in itself will not call for a change of venue unless actual prejudice is shown. *United States v. Haldeman,* 559 F.2d 31, 62–63 (D.C.Cir. 1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977);[1] *Claxton Poultry Company v. City of Claxton,* 155 Ga.App. 308, 271 S.E.2d 227, 232 (1980); *Corbetta Construction Company of Illinois v. Lake County Public Building Commission,* 64 Ill.App.3d 313, 21 Ill.Dec. 431, 440–41, 381 N.E.2d 758, 767–68 (1978); *Bryson v. Stone,* 33 Mich.App. 512, 190 N.W.2d 336, 341 (1971); *State v. Hogan,* 297 Minn. 430, 212 N.W.2d 664, 669 (1973). *See generally Nebraska Press Association v. Stuart,* 427 U.S. 539, 551–56, 96 S.Ct. 2791, 2799–2801, 49 L.Ed.2d 683 (1976). Publicity may be of such character that actual prejudice must be presumed, but the trial court did not find the publicity in this case to be of that character and this record does not demonstrate an abuse of discretion.

Appellants do not claim that the publicity necessarily caused adverse community reaction, but acknowledge that they must show such prejudice. The disaster occurred July 17, 1981; this trial took place September 13, 1983. The intensity of the publicity had considerably abated several months before trial. If, as appellants argue, the publicity had incited public passion and prejudice against them, the passage of time had done its healing work. The trial judge noted in overruling the change of venue on September 6, 1983: "Generally speaking, in the past nine to twelve months the publicity involved has been substantially reduced and consisted mainly of reporting on the three trials that have been conducted."

■ To show the public hostility toward themselves, defendants produced the results of a telephone survey of 1,000 randomly selected Jackson County residents. The findings of this survey were conditionally admitted by the trial judge, but were ultimately excluded by him. The exclusion of this survey is said to be erroneous. Appellants say that if the survey had been admitted and been given proper weight, it would have supported their application for change of venue.

The survey consisted of two questions. The first question was: "Have you heard, or read or seen any news coverage about the Hyatt Hotel skywalk collapse?" Ninety-eight percent of the respondents said they had.

The next question was, to those who answered the first question in the affirmative: "Based on what you have heard, read or seen, do you believe that in the current compensatory damage trials, the defendants, such as the contractors, designers, owners, and operators of the Hyatt Hotel, should be punished?" Five hundred thirty-six of the respondents, or 54 percent, answered yes. One hundred thirty-five, or 14 percent, answered no. One hundred one, or 10 percent, refused to comment; and two hundred twelve, or 22 percent, were reported as unable to comment.

One of the requirements for the admissibility of a survey is that it be trustworthy. This does not mean merely that it be honestly conducted, but that it be designed to

---

**1.** Responding to defendants' argument in *U.S. v. Haldeman* that prejudice in their case ought to be presumed, the court stated:

Invocation of an appellate court's supervisory power to require a continuance or a change of venue, although failure to do so did not constitute a denial of due process, would therefore introduce additional unguided discretionary line-drawing and consequent uncertainty into the process of litigating controversial cases. Moreover, this uncertainty would not guarantee a commensurate increase in the fairness of federal criminal trials. When the trial court has taken all appropriate measures to minimize pre-trial publicity, as was the case here, a supervisory fair trial standard, however stated, could not stimulate the court to additional vigilance in protecting the defendant's right to be tried on the evidence presented in court. And if an impartial jury actually *cannot* be selected, that fact should become evident at the voir dire. The defendant will then be entitled to any actions necessary to assure that he receives a fair trial. In sum, we believe that "each case must turn on its special facts." 559 F.2d at 62–63 (quoting *Marshall v. United States,* 360 U.S. 310, 312, 79 S.Ct. 1171, 1173, 3 L.Ed.2d 1250 (1959)).

yield an accurate assessment of the relevant public opinion, belief or attitude under investigation. *Pittsburgh Press Club v. United States*, 579 F.2d 751, 755–60 (3d Cir.1978) (survey inadmissible because (1) hearsay not falling into exceptions of present sense impression or presently existing state of mind and (2) not proven otherwise trustworthy since "neither objective, scientific nor impartial"); *Ways & Means, Inc. v. IVAC Corp.*, 506 F.Supp. 697, 704 (N.D.Cal.1979), *aff'd per curiam*, 638 F.2d 143 (9th Cir.) (mem.), *cert. denied*, 454 U.S. 895, 102 S.Ct. 394, 70 L.Ed.2d 210 (1981); *Allen v. Morton*, 333 F.Supp. 1088, 1094–95 (D.D.C.1971), *rev'd on other grounds*, 495 F.2d 65 (D.C.Cir.1973) (opinion survey admitted into evidence but little weight accorded it because of confusion and ambiguity in question); *Zippo Manufacturing Company v. Rogers Imports, Inc.*, 216 F.Supp. 670, 683–84 (S.D.N.Y.1963). *See generally Annot.*, 76 A.L.R.2d 619 (1961).

■ What is the public opinion, belief or attitude being inquired into upon an application for change of venue? The reason for the change of venue provisions of Rule 51 is that a party is entitled to an impartial jury to hear and decide his case. If there is in the venue from which the jury is to be drawn a pervasive hostility toward a party, or a pervasive prejudgment of the case, it will be difficult or impossible to select an impartial jury. It is assumed that the jury panel members, and ultimately the jury, will reflect the prevailing opinion of the community from which they are drawn. In such a case the party is entitled to a change of venue.

The question becomes whether the survey rejected by the trial court gave a reliable reading of whether there was in Jackson County a pervasive hostility toward defendants or a pervasive prejudgment of Sally Firestone's case. On this question, this Court cannot condemn the trial court's rejection of the survey. The responses to the critical question were not an index to the true sentiments of the community. The fault is in the design of the question. A layman's answer to the critical question (i.e., "[D]o you believe that ... the defendants ... should be punished."), having no more background than the generalized information gained from newspaper and television accounts, will reveal nothing at all about his ability to deal fairly with a specific case upon the basis of specific evidence, guided by the court's instructions and the argument of counsel. In admitting the results of a survey in *Zippo Manufacturing Company v. Rogers Imports, Inc.*, 216 F.Supp. 670 (S.D.N.Y.1963), the court noted: "The developmental phase of the project involved preparation of questions that could be handled properly by an interviewer, correctly understood by respondents [i.e., those persons interviewed in the survey] and easily answered by them. This required several drafts of questionnaires and some pretesting." *Id.* at 681.

The question asked of the interviewees in this case did not measure up to the standard of the *Zippo* questions. The question used in this survey could neither be "correctly understood" nor "easily answered" by them. The phrase "compensatory damages" summons to the lawyer's mind a certain well-defined concept. The concept includes the idea of focusing upon the plaintiff's loss, and determining the amount of money which will make him whole; the concept excludes the idea of focusing upon the quality of defendant's fault to determine what if any penalty he should pay, above the amount which will make plaintiff whole, to make the defendant smart. All this is assumed by the lawyer, but not by the layman. The ideas of compensatory as opposed to punitive damages do not spring to his mind with the term "compensatory damages."

The word "punished" is another confusing word in this context. "Punished" how? Would the answers have been the same had the persons interviewed known (as the jury was instructed in the trial of this case) that defendants had paid $20,000,000 punitive damages to be distributed among the persons injured in the disaster?

It is doubtful whether any single "yes" or "no" question could be designed which

could be relied upon to test the kind of prejudice which would disqualify a person as an impartial juror.[2] This is not such a question. Among those who answered "yes," that the defendants should be "punished," was the belief a deep-seated one, one which could not be laid aside if he were selected as a juror, or was it shallow and tentative? Did it take into account the good will which some of the defendants enjoyed in the community? It is noted that none of the defendants was named in the survey.

Appellants say the survey, even with its deficiencies, should have been admitted by the court and given such weight as it deserved. This was, perhaps, an option for the court. If evidence is remotely relevant to prove an issue under investigation, an appellate court can approve the trial court's discretionary ruling in admitting it, saying that its weight is for the trier of fact. *Modern Graphics, Inc. v. Belger Cartage Services,* 668 S.W.2d 111, 114 & n. 2 (Mo. App.1984). *See also Allen v. Morton,* 333 F.Supp. at 1094–95. Where the trier of fact is a jury, the trial court should determine, before admitting an item of evidence of doubtful or slight relevance, that the value of such evidence to prove the point in question outweighs its tendency to confuse. Where evidence is admitted which is only remotely relevant, a dispute over its meaning may engage the attention of the parties and the jury to the point of drawing them away from the ultimate issues to be decided. The judge in a bench trial is trained to evaluate evidence and is not likely to get bogged down in subordinate issues and lose sight of ultimate issues. Still, when the evidence is of such slight probative value, or of no probative value, as the trial court determined this survey to be, it was proper to exclude it altogether. It was a valid discretionary ruling. *See Ways & Means, Inc. v. IVAC Corp.,* 506 F.Supp. at 704–05.

The defendants filed a motion to reconsider the court's denial of their motion for a change of venue, to which motion was appended a second survey. The second survey contained the following prefatory explanation: "Some of the cases resulting from the skywalk collapse are now coming to trial. The jurors are being asked to determine the amounts of money those bringing suit should receive as compensation for the injuries, pain incurred, medical costs and other losses they have suffered."

There followed the question: "Do you feel that the defendants such as the contractors, designers, owners and operators of the Hyatt Hotel should be required to pay damages to those bringing suit in addition to the compensation I have mentioned?"

Over one-half of the total number of interviewees answered in the affirmative.

This question, with the prefatory explanation, was more easily understood by the layman than the question submitted in the first survey; still, the survey could not really plumb the attitudes of the respondents. If the respondents had a fixed opinion that the defendants "should be required to pay damages to those bringing suit in addition to the compensation," that would not have disqualified them as jurors in this case. That the defendants would pay punitive damages was agreed, as the jurors in the trial were expressly told by the court's instructions which will be mentioned elsewhere in the opinion.

## II

■ Appellants complain of plaintiff's counsel's references, in voir dire and in closing argument, to defendants' fault in causing plaintiff's injuries. This, the appellants say, violated the settlement agreement under which the trial was conducted and the in limine rulings of the trial judge. The settlement agreement provided that

---

**2.** Compare preparation and conduct of questions used in public opinion survey to determine bias of local citizens in criminal case against a black man accused of rape of a white girl, described in 66 Harv.L.Rev. 498, 509

(1953). The defendant's conviction had earlier been reversed in *Shepherd v. State of Florida,* 341 U.S. 50, 71 S.Ct. 549, 95 L.Ed. 740 (1951), and case was pending upon retrial in Florida.

defendants "will not contest liability for such damages" and provided further that plaintiff "may not present evidence of the conduct of any settling defendant."

There was no evidence offered relating to defendants' conduct. In one instance where plaintiff's counsel characterized defendants' conduct as "careless," defendants objected, and the court sustained the objection and granted defendants' request to instruct the jury to disregard the offending remark.

In closing argument, plaintiff's counsel said: "[W]hat we have here in this case is, after two years, these defendants finally admit their fault and agree to not contest liability." Defendants' motion "to strike counsel's comments" was sustained, and defendants' request "to instruct the jury to disregard the comment and reprimand counsel from approaching the subject again" was granted.

Appellants cite other instances of plaintiff's counsel's saying that "defendants crushed and paralyzed (plaintiff)," without objection by defendants.

In each instance where an objection was made, defendants received all the relief requested.

Plaintiff's counsel's statements do not call for a reversal. The case was not tried in a vacuum. The jury was not so uninformed as to believe that defendants claimed no culpability in the event which caused plaintiff's injuries. The jury was instructed in one of the court's written instructions:

The only issue in this case at this trial is the amount of compensatory damages, if any, to which Miss Firestone is entitled. No issue relating to the blame of any defendant for the events of July 17, 1981, is before you because those questions have previously been resolved under the agreement by which Miss Firestone shall receive additional payments from a separate fund created by defendants.

Similarly, all issues relating to the punishment of any defendant or the punitive damages to be awarded to any class

member have previously been resolved by this agreement. Under that agreement, defendants have created a fund which will be divided between each member of the group, such as Miss Firestone, who chooses to have a jury decide the amount of compensatory damages.

The jury was further instructed on request of defendants: "In determining the amount of any damages of plaintiff, you must not consider fault or responsibility for the skywalks collapse since any punitive damages or aggravating circumstances are being handled outside of this trial by payment from a fund which exists for that purpose."

These instructions made it clear to the jury that they were to focus upon compensation to plaintiff without regard to defendants' fault. They neutralized any prejudice which plaintiff's counsel's statements might have caused.

### III

■ Appellants complain of evidence and argument which referred to plaintiff's poverty. They correctly argue that evidence of, or comments upon, plaintiff's poverty (or for that matter the financial status of either party) is generally condemned. *Lewis v. Hubert*, 532 S.W.2d 860, 866 (Mo.App. 1975). Evidence touching upon a party's financial condition may be relevant to the issues, however, in which case they are allowed. *Pyles v. St. Louis Public Service Company*, 372 S.W.2d 114, 116 (Mo.1963); *Lewis v. Hubert*, 532 S.W.2d at 866; *Graves v. Thomas*, 95 Ind. 361, 365–66 (1884); *Airline Motor Coaches, Inc. v. McCormick*, 186 S.W.2d 689, 691 (Tex.Civ. App.1945). *Cf. Felty v. General Telephone Company of Illinois*, 47 Ill.App.3d 427, 5 Ill.Dec. 730, 362 N.E.2d 43 (1977), *rev'd sub nom. Felty v. New Berlin Transit, Inc.*, 71 Ill.2d 126, 15 Ill.Dec. 768, 374 N.E.2d 203 (1978), *on remand modified sub nom. Felty v. General Telephone Company of Illinois*, 73 Ill.App.3d 572, 29 Ill.Dec. 754, 756, 392 N.E.2d 311, 313 (1979) (adopting as opinion of the court that part

of the dissenting opinion in *Felty v. General Telephone Company of Illinois* reported at 5 Ill.Dec. at 738–740, 362 N.E.2d at 51–53) (Evidence of injured plaintiff's wife's heart condition, pacemaker, and attendant future periodic surgical hospitalization costs routinely paid before plaintiff's injury by plaintiff's union hospitalization program (1) admitted on issue of damages and (2) held not prejudicial on issue of liability because properly admitted evidence of the grievous nature of plaintiff's injuries and its potential for evoking jury sympathy and passion overshadowed any potential for evidence of wife's heart condition to prejudice the jury); *Ross v. Pfeifer*, 39 Ill.App.3d 789, 350 N.E.2d 797, 802 (1976) (Evidence of family circumstances in personal injury action relevant to issues of "the impairment of decedent's ability to engage in social and recreational activities and to enjoy the society of others"). This is such a case.

■ The instances of testimony and of attorney's comment of which defendants complain emphasized the reversal of plaintiff's fortunes resulting from the accident, and contrasted her status before the accident with her status after the accident. Her precipitous comedown was without any doubt an inescapable and a large element in the total personal loss incurred by the plaintiff. The evidence was not directed to show her poverty *per se*, although indirectly it showed that condition. Contrast *Smith v. St. Louis Southwestern Ry.*, 31 S.W.2d 105, 107 (Mo.App.1930).

She had lived by herself in a spacious and well-appointed cooperative; she now lived in a smaller and cheaper apartment which she shared with her parents. The evidence did not show that financial privation had forced this move, but that the co-op could not accommodate her wheelchair. The apartment, on the other hand, was arranged so that she could be wheeled in her wheelchair from the apartment to her van.

Where she was claiming total and permanent disability and loss of future income, it was competent for her to explain that her continued employment by IBM was an act of charity on its part, and that from her own standpoint her employment was necessitated by the need for income.

Where she was claiming the need of constant skilled and semi-skilled medical attendance and the need for sophisticated and expensive equipment, it was competent for a witness to explain the reason she did not have such attendance and equipment was that she did not have the money to pay for them.

That she acquired a specially-equipped van by the sale of her car and by loans from IBM and from her father really do not of themselves show poverty and are not prejudicial to defendants. It was perfectly proper for the plaintiff to attempt to bring home to the jury the sting of her deprivation and her dependence directly resulting from the accident.

### IV

■ Appellants complain of plaintiff's testimony about her desire to investigate studies and experiments aimed at improving the lot of disabled people, with an eye toward establishing some such work in Kansas City. Appellants' complaint here is that this was an "open solicitation for a charitable contribution in the guise of a verdict." They say that "her charitable solicitation irrevocably tainted the trial."

The question which elicited this testimony from the plaintiff was: "Give me some more explanation of what you would do once you received—actually received your compensation and could leave IBM." (The question followed testimony about her IBM employment after her injury, the point of which was that the employment was unsatisfactory from the standpoints both of IBM and herself.) Defendants objected to the question on the ground that it called for "speculation." Defendants do not here follow through with that objection. They now attack plaintiff's answer on a different ground, as noted above, that the testimony of the contemplated philanthropic project was an appeal to the jury's charitable im-

pulses. Defendants must stick with the theory of their trial court objection, and may not present here some different reason that the testimony should have been excluded. *Stahlheber v. American Cyanamid Company,* 451 S.W.2d 48, 60–61 (Mo. 1970).

As for plaintiff's actual answer to the question (which defendants might not have anticipated, although plaintiff had given similar testimony in her deposition taken before trial), defendants did not ask for any relief after the testimony came in. Any objection, except on the stated ground that the question called for speculation, was waived. *See Stalheber v. American Cyanamid Company,* 451 S.W.2d at 60–61.

Was the allowance of the testimony plain error? Rule 84.13(c). It is difficult to believe that the testimony about a tentative, nebulous project, which was no more than in the daydream stage, could have prejudiced defendants. Juries are not so easily led astray.

### V

■ Appellants say that the court erred "in failing to declare a mistrial after respondent presented evidence of the costs and fees associated with the litigation."

This point refers to only the testimony of Dr. Goldstein, a medical economist testifying for plaintiff. He had testified to a need for more than $7,000,000 for plaintiff's future medical expenses. On cross-examination, defendants elicited the information that he had charged a fee of $3,200. Then on redirect examination the following occurred:

Q. (By plaintiff's counsel) So when we talk about a need for Sally of over $7,000,000, does that include your fee?

A. No, sir.

Q. *Or any other fees?*

A. No, sir.

(Emphasis in appellants' brief.)

Defendants moved for a mistrial, which was denied.

Appellants argue that the testimony that Dr. Goldstein's estimated $7,000,000 for future medical expenses did not include his own fee "or any other fees" "brought the subject of attorneys fees and litigation expenses squarely to the fore."

The trial court was well within its discretion in denying the radical remedy of mistrial. Defendants asked for no more conservative relief. *Johnson v. McNeal,* 654 S.W.2d 91 (Mo.App.1980); *State ex rel. State Highway Commission v. Drisko,* 537 S.W.2d 645, 648–49 (Mo.App.1976).

■ Appellants continue the same theme by attention to a part of plaintiff's counsel's closing argument:

Then, [defendants' counsel] says we can give her—here, he wants five million dollars, and she can get ten percent, and that is half a million a year.

\*        \*        \*        \*        \*        \*

([I]t's not just you walking down and putting the money up and getting back a half a million. That is not the way the real world works. You have got to pay your dues in the real world, and *you have got to pay Dr. Goldstein his $3,200 fee. Things have to be paid, and then you take what you have left and fight inflation with it.*

(Emphasis in appellants' brief.)

Appellants did not object to the argument, and may be held to have waived any objection thereto. *Federal Deposit Insurance Corporation v. Crismon,* 513 S.W.2d 305, 307 (Mo.1974); Rule 84.13(a). Beyond that, where the defendants had based their arguments upon the assumption that all of any award would be plaintiff's to invest, without any diminution, it is not plain error for plaintiff's attorney to suggest to the jury that the award would be somewhat diminished by Dr. Goldstein's fee of $3,200 and "things that have to be paid." What the jury understood from the reference to "things that have to be paid" can only be guessed. The jury was not so naive as to suppose that the award would be undiminished and there is no prejudice to the defendants demonstrated by the quoted argu-

ment. Certainly it is not a situation where the trial court can be convicted of error for failure sua sponte to take some corrective action.

## VI

■ Appellants attack the size of the verdict on the ground it was excessive. They do not claim that the size of the verdict entitles them to a new trial on the ground that it was the product of the jury's passion and prejudice,[3] *Blevins v. Cushman Motors*, 551 S.W.2d 602, 614–15 (Mo. banc 1977); they ask for a total remittitur of $7,500,000 which would result in a $7,500,000 award instead of the trial court's remitted judgment of $12,750,000.

■ Plaintiff requests restoration of the $2,250,000 required to be remitted by the trial judge as a condition to denial of a new trial, claims the $15,000,000 verdict was proper and that failure to enter it as a judgment in her favor was erroneous.

This is the first appeal to this Court involving remittitur since promulgation of Rule 78.10, effective Jan. 1, 1981. The rule provides:

> Consenting to a remittitur as a condition to the denial of a new trial does not preclude the consenting party from asserting on appeal that the amount of the verdict was proper or that the amount of the remittitur is excessive. A party consenting to a remittitur may not initiate the appeal on the ground but may raise the same on the other party's appeal.

The amount of damages in a case of this nature is for the jury in the first instance; and in this case the jury awarded plaintiff $15,000,000 which the trial court remitted to $12,750,000 as a condition to denial of a new trial to defendants.

Under the doctrine of remittitur in Missouri, such an order of remittitur by the trial court constitutes a ruling upon the weight of the evidence, *Morris v. Israel Brothers, Inc.*, 510 S.W.2d 437, 447 (Mo.

1974). If there is an abuse of discretion in failing to order a remittitur or in the amount of remittitur ordered the judgment is reviewable by the appellate court. *Dodd v. Missouri-Kansas-Texas R. Co.*, 354 Mo. 1205, 193 S.W.2d 905 (1946); *Williamson v. Wabash Railroad Co.*, 355 Mo. 248, 196 S.W.2d 129 (1946), *cert. denied*, 330 U.S. 824, 67 S.Ct. 860, 91 L.Ed. 1274 (1947). *See Ricketts v. Kansas City Stockyards of Maine*, 537 S.W.2d 613, 621 (Mo.App.1976).

This Court has often recognized that there is no precise formula for determining whether a verdict is excessive; each case has been considered on its own facts. Although consideration is properly given to the nature and extent of the injuries and the diminished earning capacity, economic conditions, plaintiff's age, and a comparison of the compensation awarded and permitted in cases of comparable injuries, "[t]he ultimate test is what fairly and reasonably compensates plaintiff for the injuries sustained." *Graeff v. Baptist Temple of Springfield*, 576 S.W.2d 291, 309 (Mo. banc 1978). *See also Tennis v. General Motors Corp.*, 625 S.W.2d 218, 229 (Mo. App.1981).

Sally Firestone was 34 years old at the time of the skywalk collapse. She was employed at IBM repairing computing systems and received an annual salary of $33,-000 including fringe benefits. Outside of work she was very active socially and had a wide range of interests. This was changed drastically by the Hyatt skywalk collapse.

After the accident, Sally was brought to the emergency room of Kansas University Medical Center. She had lost 80 percent of her blood and required massive blood transfusions. The events which followed included: Sally was attached to a mechanical breathing device. She was treated for scalp lacerations. Catheters were inserted, including one to measure the pressure in the pulmonary artery and cardiac functions. This involved the catheter being brought through a vein in the arm up to

---

**3.** Excessiveness by misconduct vitiates the verdict in its entirety and necessitates a new trial on all issues. *Moore v. Glasgow*, 366 S.W.2d 475, 478 (Mo.App.1963). This rule remains inviolate under this decision.

her heart and into the pulmonary artery. X-rays revealed severe fracture and dislocation of the spine at the level of the fourth, fifth and sixth cervical vertebra— her spinal cord was severed. Sally was classified as a C–5 quadriplegic; she has no movement below the shoulder level with the exception of some use of her biceps enabling her to lift her arms but leaving her without control to lower them. Sally was placed in traction via tongs attached to her skull. An intercranial pressure monitoring device was installed by drilling a hole into the skull. Both of Sally's legs were broken. She developed respiratory distress syndrome requiring a tracheotomy and attachment to a respirator. Her airway passage frequently clogged with phlegm causing her extreme difficulty in breathing. Complications developed and multiple transfusions were necessary. She underwent grueling neurological testing to determine the extent of damage and an operation to stabilize her neck. Following surgery she suffered a gastric hemmorage, bladder infections and pneumonia.

A total of 3 months was spent in Kansas University Medical Center; 2½ months were in intensive care. Most of this time she was unable to speak due to tubes through her nose and throat. She also had to take anti-seizure drugs which caused hallucinations.

After Sally left Kansas University Medical Center, she spent 4 months at the Craig Institute, a rehabilitation center for brain and spinal cord injuries. There she learned how to operate an electric wheelchair. She had an operation to insert a suprapubic catheter which she is unable to reinsert by herself when necessary. She learned her bowel movements would have to be initiated by suppositories or digital stimulation. Numerous medical complications that arise for quadriplegics were explained to her— among these are respiratory and circulatory problems resulting in lightheadedness, nausea and vomiting.

Sally requires "round-the-clock" attendance, continuing therapy, and expensive specialized equipment. Her psychologist testified she will continue to need professional help in dealing with the emotional aspect of her injury and disability. Both the treating neurosurgeon and a doctor that works primarily with quadriplegics testified that her injuries were the worst they had ever seen.

Sally's life expectancy was calculated to be 46.54 years. Her economic loss according to the testimony of Dr. Goldstein was $7,076,771 (discounted to present value). This included medical expenses to time of trial plus necessary future medical expenses and lost earnings. Using a 50-year history of growth rates and interest rates, Dr. Goldstein calculated that over such a span of time a discount rate of 1.6 percent, representing real return upon money, was reasonable. He explained his methodology and testified that it was accepted by the economic community. His credentials as an expert economist were not challenged.

■ Although appellants criticize the discount rate employed by Dr. Goldstein, they made no objection to the admission of the witness's testimony, arrived at by the use of what they now say was a spurious discount rate. They do not now make any claim of error in its admission, except as a part of their argument for additional remittitur.

Witness Goldstein's testimony was before the jury. He was cross-examined on a variety of subjects, including the discount rate. Defendants offered their own economic expert, Dr. Gerald Olson, who opted for a higher discount rate of 9.5 percent, and presented his reasons for using that discount rate in preference to Dr. Goldstein's 1.6 percent discount rate. The jury could evaluate the conflicting opinions of the two economists. *Green v. Hastings*, 621 S.W.2d 549, 550 (Mo.App.1981). This Court cannot say which economist's conclusion, if either, is reflected in their verdict. Thus, the discount rates establish no ground for remittitur.

■ The jury is vested with a broad discretion in fixing fair and reasonable compensation to an injured party, *Graeff*,

576 S.W.2d at 309, and the foregoing evidence of plaintiff's injuries substantiates the jury's award to her in this case. Such a record does not authorize a trial court in the exercise of reasonable discretion to order any portion of it remitted, and the jury's verdict must be restored. *Dodd,* 193 S.W.2d at 907.

### VII

As indicated at the outset, this case lends emphasis to the problems and conflicting philosophies associated with the remittitur practice and demonstrates a basis for its abolishment. The doctrine is not a provision of statute or rule in Missouri. It has been impressed by practice on the new trial consideration where its application constitutes an invasion of the jury's function by the trial judge. Such applications have been frought with confusion and inconsistency.[4] Its application in the appellate courts has been questioned since its inception in Missouri as an invasion of a party's right to trial by jury and an assumption of a power to weigh the evidence, a function reserved to the trier(s) of fact. *See Burdict v. Missouri Pacific Railway Co.,* 123 Mo. 221, 27 S.W. 453, 458–466 (1894) (Barclay, Gantt, and Sherwood, JJ., dissenting). This Court has voiced recent concern for reconsideration of the doctrine. *See Worley v. Tucker Nevils, Inc.,* 503 S.W.2d 417, 424, 428 (Mo. banc 1973) (Donnelly, C.J., concurring; Bardgett, Seiler and Morgan, JJ., dissenting).

What may have begun with a worthy purpose of bringing uniformity to verdicts and judgments for unliquidated damages has been eroded by added considerations and irreconcilable case by case evaluations.

Abolishment of the remittitur practice in Missouri does no violence to the power and discretion of trial courts to control jury verdicts. The 1975 revision of Rule 78.01 provides concisely that the trial court may grant a new trial of any issue upon good cause shown, and it may be granted to all or any of the parties and on all or part of the issues after trial by jury, court or master. As the revisers noted, there is no intention to eliminate any of the reasons for which new trials have been granted or to change the law concerning the grounds for granting a new trial. Rule 78.02 continues the authority and discretion of the trial court to grant one new trial on the ground the verdict is against the weight of the evidence. *See Clark v. Quality Dairy Company,* 400 S.W.2d 78 (Mo.1966). This power and discretion should no longer be adulterated by a remittitur practice which permits the trial court to find error in its trial and excuse the error upon remittitur of a commanded portion of the jury's verdict, only to see the case appealed despite the remittitur, including a charge of error in the amount of remittitur ordered.

The Court concludes that remittitur shall no longer be employed in Missouri.

Accordingly, the verdict of the jury is affirmed and the cause is remanded with directions to set aside the order of remittitur, reinstate the verdict and enter judgment for plaintiff for the verdict sum of $15,000,000; and the doctrine of remittitur is abolished in Missouri.

RENDLEN, C.J., BILLINGS and DONNELLY, JJ., DOWD, Special Judge, and MORGAN, Senior Judge, concur.

WELLIVER, J., dissents.

GUNN and BLACKMAR, JJ., not sitting.

---

4. As a recent example, this case was tried in Jackson County September 21, 1983; *Kenton v. Hyatt Hotels, Corp.,* et al., —— S.W.2d —— (Mo. banc 1985), No. 66839, was previously tried in Jackson County June 30, 1983. Both cases were tried before seasoned trial judges. The remittitur ordered in this case was 15 percent of a $15,000,000 verdict; the remittitur ordered in the prior case was 6¼ percent of a $4,000,000 verdict. Both plaintiffs sustained serious injuries and both produced substantial evidence to support the jury awards of fair and reasonable compensation for their injuries.