**Mark WALDORF, Plaintiff,**

v.

**Edward J. SHUTA, et al., Defendant.**

**Civ. No. 84–3885 (WHW).**

United States District Court, D. New Jersey.

Feb. 26, 1996.

424

Warren W. Wilentz, Michael J. Barrett, Wilentz, Goldman & Spitzer, Woodbridge, New Jersey, for Plaintiff Mark Waldorf.

Richard A. Amdur, Amdur, Boyle, Maggs & McDermott, Eatontown, New Jersey, for Defendant Borough of Kenilworth.

George B. Henkel, Soriano, Henkel, Biehl, Matthews & Marinello, Bloomfield, New Jersey, for Defendant Edward J. Shuta.

Richard M. Tango, McDermott & McGee, Millburn, New Jersey, for Defendant Kenneth C. Spence.

Steven Backfisch, Whipple, Ross & Hirsh, P.A., Parsippany, New Jersey, for Defendant Joseph Rego.

Thomas V. Manahan, Satterlee, Stephens, Burke & Burke, Summit, New Jersey, for Certain Former Public Officials of Kennilworth.

**OPINION**

WALLS, District Judge.

In the latest trial in this case, a jury rendered a verdict of $3,086,500 for plaintiff Mark Waldorf ("Waldorf"), including $2,500,000 for pain and suffering and $586,500 for past and future lost earnings. Waldorf argues that these amounts were shockingly low and against the weight of the evidence. Hence, he moves for a new trial. In the alternative, Waldorf moves for additur.

I. *Background*

On November 17, 1982, Mark Waldorf was involved in a motor vehicle accident in Kenilworth, New Jersey. As a result, he became a C6–C7 quadriplegic. Waldorf then sued defendant Borough of Kenilworth (the "Borough") as well as numerous other parties.

In 1988, the case was tried to determine liability and damages. The jury awarded Waldorf $8,400,000. The Borough and one of its police officers appealed several issues.

Waldorf appealed partial summary judgments in favor of the Borough on two issues. Our Court of Appeals affirmed in part, reversed in part, and remanded for a new trial.

On July 28, 1992, the Borough admitted liability in the case. On August 4, 1992, the magistrate judge incorporated this admission into a case management order.

In September 1992, the case was retried. This time, the jury awarded Waldorf $16,135,716, of which $15,000,000 was for pain and suffering. The defendants moved for a mistrial on the grounds that the jury had been inadvertently exposed to media coverage of a $30,000,000 verdict awarded in a similar case. The trial judge denied the motion. The Third Circuit vacated the verdict and remanded for a new trial.

In October 1995, the case was tried yet again, this time before me. Here, the jury awarded $3,086,500. Of this amount, $2,500,000 was for pain and suffering, $195,000 for past lost earnings and $391,500 for future lost earnings.

II. *Standard for granting a motion for a new trial*

■ A court may set aside a jury verdict as contrary to the preponderance of the evidence even though a judgment notwithstanding the verdict would not be justified. *DePascale v. Penn R. Co.*, 180 F.2d 825 (3d Cir.1950). A motion for a new trial may be based, among other things, on the grounds that a verdict is against the weight of the evidence, that an award of damages is excessive or inadequate, or for other reasons the trial was not fair to the moving party. *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251, 61 S.Ct. 189, 194, 85 L.Ed. 147 (1940). A court may grant a new trial if one is needed to prevent injustice or to correct a verdict that was against the weight of the evidence. *American Bearing Co. v. Litton Indus., Inc.*, 729 F.2d 943, 948 (3d Cir.1984), *cert. denied*, 469 U.S. 854, 105 S.Ct. 178, 83 L.Ed.2d 112 (1984).

■ The authority to grant a new trial rests within the sound discretion of the court, *Allied Chemical Corp. v. Daiflon, Inc.*, 449

U.S. 33, 36, 101 S.Ct. 188, 190–91, 66 L.Ed.2d 193 (1980) (per curiam), but if the judge is not convinced that there has been a miscarriage of justice, then it is his or her duty to respect the jury's verdict. *See Magee v. General Motors Corp.*, 213 F.2d 899, 900 (3d Cir.1954). For a court to disturb a jury verdict, the damages assessed by the jury must be so unreasonable as to offend the conscience of the Court. *Murray v. Fairbanks Morse*, 610 F.2d 149, 152 (3d Cir.1979).

### III. *Analysis*

#### A. *Motion for a new trial*

Waldorf moves for a new trial on the ground that the verdict was shockingly low and against the weight of the evidence. In this regard, he first attacks the award of $2,500,000 for pain and suffering "on its face." Waldorf then directs his fire against the awards for past and future economic losses. These, he claims, were inadequate and contrary to the weight of the evidence because of "unfairly prejudicial evidence and erroneous court rulings...." Pl.'s Br., at 21. Specifically, he points to three events during the trial: 1) the Court's decision to permit Dennis Rizzo ("Rizzo") to testify; 2) the Borough's misuse of the testimony of James Pascuitti; and 3) the Borough's closing remarks regarding occupational therapy.

The Court now considers these arguments.

#### 1. *The award for pain and suffering*

■ Waldorf claims that the $2,500,000 award for pain and suffering was inadequate. In support of this argument, he provides a short history of his injuries, medical and rehabilitative treatment, and related problems. He also cites three cases where plaintiffs won larger monetary judgments.

First, the Court disagrees that the $2,500,000 award for pain and suffering was, "on its face," against the weight of the evidence. While clearly Waldorf is a sympathetic figure, this is not a basis for the Court to substitute its judgment of the facts and the credibility of the witnesses for that of the jury.

Moreover, there is no evidence that the jury was swayed by any passion or prejudice that might have made it disregard the weight of the evidence. Nor is there any proof that the jury ignored the issue of pain and suffering or otherwise gave it short shrift. Indeed, the jury had ample opportunity to consider this question. Waldorf's counsel raised the issue of the plaintiff's pain and suffering repeatedly during the trial in their opening and closing arguments as well as in their examinations of him, Kristjan Ragnarsson ("Dr. Ragnarsson"), Joshua Feibusch, and others. Moreover, and importantly, the jury had the chance to observe Waldorf on the stand, in the courtroom seated at or next to his counsels' table, in a day-in-the-life-of video, and even performing a short demonstration of his exercise routine. After closing arguments, the jury deliberated approximately seven hours.

The Court finds no reason to second-guess the jury and its decision on the pain and suffering award. The Court determines that this decision was not, on its face, against the weight of the available evidence.

The Court turns now to the issue of the adequacy of the pain and suffering award. In this regard, the Third Circuit has noted that the examination of awards in other cases involving similar injuries serves as a helpful guide to whether a particular award is excessive. *Motter v. Everest & Jennings, Inc.*, 883 F.2d 1223, 1230 (3d Cir.1989). Nonetheless, it has also suggested that courts remain mindful that each verdict revolves around a unique set of facts and circumstances. *Id.*

The first case Waldorf cites, *Harrigan v. Ford Motor Co.*, 159 Mich.App. 776, 406 N.W.2d 917 (1987), involved an automobile accident victim who became a C6–C7 quadriplegic. He won $12,000,000. The second one, *Firestone v. Crown Center Redevelopment Corp.*, 693 S.W.2d 99 (Mo.1985), pertained to a 34–year–old C4 quadriplegic. She won $15,000,000. The third, *Fleck v. KDI Sylvan Pools, Inc.*, 1991 WL 261659 (E.D.Pa. Dec. 6, 1991), *aff'd in part, rev'd in part, and remanded*, 981 F.2d 107 (3d Cir. 1992), represents a claim for a diving accident victim who became quadriplegic. He won $10,000,000.

These cases are not particularly apposite here. First, the damages in *Harrigan* and

*Firestone* include both pain and suffering and economic losses. Because Waldorf is only attacking the sufficiency of the pain and suffering award, it is misleading to compare the $2,500,000 figure he won to the $12,000,000 and $15,000,000 figures the plaintiffs received in these other two cases. In *Firestone,* for example, Firestone's expert estimated that her economic losses, including medical expenses to time of trial plus necessary future medical expenses and lost earnings, were about $7,000,000 (discounted to present value). If the jury relied on this figure, presumably its pain and suffering award was around $8,000,000.

*Harrigan* and *Firestone* are also misleading here because the $12,000,000 and $15,000,000 figures presumably include medical expenses, whereas in Waldorf's case, medical expenses were not ingredients of the verdict (a statute provides for all of his necessary medical expenses for life without limitation). In addition, the court in *Fleck* simply refers to a $10,000,000 verdict; it is unclear whether this includes economic damages, or if it is limited to pain and suffering.

Second, a closer look at the three cases relied upon by Waldorf indicates that they differ in significant respects from the one tried in this Court. In *Harrigan,* Harrigan, a truck driver, was involved in a truck accident, and became a C6–C7 quadriplegic. He was paralyzed from the collarbone down. According to the court, "[h]e has no function of the muscles of his lower extremities, his hands, his trunk or his abdomen. He has very limited control of some arm and shoulder muscles." Harrigan sued Ford in a products liability action. The jury found that he was 75 percent negligent, and he received a judgment for about $3,000,000.

In *Firestone,* Firestone was injured when a skywalk she was on collapsed. She became a C5 quadriplegic. The court noted that "she has no movement below the shoulder level with the exception of some use of her biceps enabling her to lift her arms but leaving her without control to lower them." *Firestone,* 693 S.W.2d at 109. Firestone suffered a horrible myriad of ills as a result of the accident. Among other things, she lost 80 percent of her blood, requiring massive blood transfusions, and broke both of her legs. She also developed respiratory distress syndrome, which required a tracheotomy and attachment to a respirator; had extreme difficulty in breathing as her airway passage frequently clogged with phlegm; had surgery to stabilize her neck; and suffered gastric hemorrhage, bladder infections and pneumonia. She spent three months in the hospital, 2.5 months of which was in intensive care. Most of the time she could not speak, and she had to take anti-seizure drugs which caused hallucinations. After leaving the hospital, she spent four months at a rehabilitation center.

In *Fleck,* Fleck was a young man who became a quadriplegic after diving into a three-and-one-half foot above-ground swimming pool and breaking his neck. The pool and its replacement pool liner did not have depth markers or "No Diving" signs. The jury, in comparing Fleck's negligence to that of the pool owner, found Fleck 64 percent negligent (although the court did not reduce the amount of Fleck's damages since the jury found he could also recover on a strict products liability theory).

Plainly, Waldorf's injuries are horrific and his medical treatment and rehabilitation involved a great deal of pain. They must not be minimized. However, the Court is not convinced, even in light of the cases he has cited, that the jury's pain and suffering award is inadequate on its face.

The Court's conclusion in this regard is reinforced by a survey of other cases involving facts similar to this one. The Court first considers cases decided by courts in this circuit. However, research only indicates one such case. In *Dawson v. Chrysler Corp.,* 630 F.2d 950 (3d Cir.1980), a policeman who was rendered a quadriplegic in an automobile accident brought a products liability action against Chrysler. The jury awarded him $2,064,863 for his expenses, disability, and pain and suffering. Chrysler moved for judgment notwithstanding the verdict or, alternatively, for a new trial. The district court denied both motions. The Third Circuit affirmed.

The Court now looks at cases from other jurisdictions. In *Moore v. Subaru of America*, 891 F.2d 1445 (10th Cir.1989), Moore, a rear-seat passenger in an automobile, was injured in an automobile accident. He became a quadriplegic. After Moore (and another) sued, the trial was bifurcated. The jury first found for Moore on the issue of liability and then, later, rendered a verdict for him in the amount of $1,500,000. On appeal, Moore argued that the verdict was inadequate. He claimed that since there was evidence that his past and future medical expenses would be over $4,700,000, the jury could not have considered any damages for pain and suffering. The Tenth Circuit upheld the award. It ruled that, "[a]bsent an award so grossly inadequate as to raise an irresistible inference that bias, prejudice, or passion invaded the trial or so as to shock the court's conscience, a jury's determination of damages will be upheld." *Id.* at 1451–52. The court noted that the jury may simply not have been convinced by the testimony of Moore's expert concerning medical expenses. It refused to alter the jury's verdict without further proof of jury passion or prejudice.

A trio of Louisiana cases is also relevant. The plaintiff in *Bernard v. State*, 563 So.2d 282 (La.App.1990), for example, was injured when he was a passenger in an automobile owned by one person and driven by another, and became a C5–C6 quadriplegic. After a bench trial, the trial judge entered an award for pain and suffering. According to the appellate court, the trial court

> stated that it had previously made an award in a C5–C6 level quadriplegic case. It compared the case of Jeffrey Bernard with the other case, it considered the video submitted by Jeffrey Bernard, and all other quadriplegic cases and determined that an award of $3,000,000 was reasonable.

at 287. The appellate court went on to note that

> [i]n the context of an award for pain and suffering, extremely great leeway must be granted to the trial fact-finder, who has been afforded the best opportunity to observe first-hand the evidence showing plaintiff's anguish and agony and the prospect of continued pain and suffering.

*Id.* (*citing Hatcher v. State*, 467 So.2d 584 (La.App.1985)) The court then affirmed the pain and suffering award.

In *Hatcher v. State*, 467 So.2d 584, the plaintiff became a quadriplegic as a result of an automobile collision at an intersection. The jury awarded him a verdict of $1,250,000 for pain and suffering. On appeal, the court upheld the award.

*Hardy v. State*, 412 So.2d 208 (La.App. 1982), involved a plaintiff with a life expectancy of 31.6 years who was rendered physically helpless from a brain stem injury sustained in an automobile accident. He was awarded $1,500,000 for pain, suffering, and disability. The court reduced this amount to $750,000.

In *Ossenfort v. Associated Milk Producers, Inc.*, 254 N.W.2d 672 (Minn.1977), the Minnesota Supreme court upheld the trial court's award of $1,000,000 to 34–year old truck driver who suffered organic brain damage and was rendered a spastic quadriplegic in a motor vehicle accident.

For other cases, see *Heitzenrater v. United States*, 930 F.2d 33 (10th Cir.1991) (reducing $2,000,000 award for pain and suffering for psychiatric patient who fell seven stories and became quadriplegic to $1,000,000); *Siverson v. United States*, 710 F.2d 557 (9th Cir.1983) (upholding award of $1,000,000 for pain and suffering for man with arthritic spinal condition who fell and became a C6–C7 quadriplegic); *Stratis v. Eastern Air Lines, Inc.*, 682 F.2d 406 (2d Cir.1982) (finding that award of $3,510,000 for future pain and suffering plus disability to seaman who was rendered quadriplegic as a result of airplane crash was excessive by at least one half); *Griffin v. United States*, 500 F.2d 1059 (3d Cir.1974) (affirming trial judge who awarded woman $1,200,000 for pain and suffering after she became quadriplegic from ingesting an oral live virus polio vaccine); *Mesick v. State of New York*, 118 A.D.2d 214, 504 N.Y.S.2d 279, *leave denied*, 68 N.Y.2d 611, 510 N.Y.S.2d 1025, 502 N.E.2d 1007 (1986) (reducing an award of $2,500,000 for pain and suffering to a young man rendered a quadriplegic to $1,000,000); *Kunz v. Kunz*, 135 Wis.2d 542, 401 N.W.2d 27 (1986) (noting

that ski hill employee who was rendered quadriplegic received $1,750,000 for pain and suffering and disability in a separate lawsuit); and *Chrisler v. Holiday Valley, Inc.,* 580 S.W.2d 309 (Mo.App.1979) (affirming a total award of $2,300,000 to plaintiff who was rendered a quadriplegic in diving accident).

Having completed this survey, the Court determines that the $2,500,000 pain and suffering award is not inadequate on its face. Nor is it contrary to the weight of the evidence. And it is certainly not so unreasonable as to be a miscarriage of justice or to offend the conscience of the Court. Therefore, the Court denies Waldorf's motion for a new trial on this ground.

### 2. *The award for past and future economic losses*

Waldorf claims that "notwithstanding the uncontroverted testimony that the clear majority of quadriplegics do not return to work, the jury found that plaintiff had failed to mitigate his damages, and the jury went on to drastically reduce plaintiff's past and future lost wage claims." Pl.'s Br. at 21. "[T]he likely answer for [this] erroneous conclusion," he avers, "lies with the following: 1) the Court's decision to permit Rizzo to testify; 2) the Borough's misuse of Pascuitti's testimony; and 3) the Borough's closing remarks regarding occupational therapy. Id.

█ As a threshold matter, Waldorf's emphasis on the supposedly uncontradicted testimony that only 15 to 30 percent of quadriplegics are able to return to work is somewhat beside the point. This is so because the evidence is also undisputed that Waldorf can and should work. As Waldorf's own expert, Dr. Ragnarsson, responded:

Q. Do you believe ... that Mark Waldorf can work?

A. Yes....

Q. Do you believe that he should work?

A. I believe that it would be—I believe that in general its [sic] good for all people to work. I think that it helps with physical and mental health, and I think in particular that people who have a physical disability, if they are fortunate to find a job and be active on it and successful, that they will fair [sic] better,

not just socially and financially, but also health wise.

(T4.115:25–116:9). This testimony was also bolstered by Waldorf's vocational expert, Dr. David Stein, who opined that there was no physical or mental reason why Waldorf could not take college correspondence courses from home. See T4.145:3–9.

In other words, the supposed fact that *most* quadriplegics may not be able to return to work is relevant only in the absence of uncontroverted evidence that Waldorf can and should work. Because Waldorf's own doctor suggested that Waldorf could and should work (and could continue his education), it would be unreasonable for the jury *not* to consider whether Waldorf had failed to mitigate his damages.

To help it make this determination, the jury heard and saw evidence about Waldorf's physical capabilities and limitations. It listened to testimony about activities he had been involved in since the accident, about whether he had been employed or sought work during this period, and about what opportunities there were for people in his position. The jury also observed Waldorf during most of the trial and also had plenty of chance to evaluate his credibility and that of the other witnesses.

Evidently, after hearing and seeing all the evidence, the jury decided that Waldorf had failed to mitigate his damages. That is, the jury determined that it would ignore or discount the figures for past and future earnings offered by Waldorf's economic expert. And, as this Court clearly pointed out in its charge, the jury was free to do so. It was not bound by anything this or any other witness said. Instead, the jury had a duty to find the facts and judge the credibility of all the witnesses, including the plaintiff. To my mind, it did so.

### a. *The Court's decision to permit Rizzo to testify*

█ Rizzo testified as an expert witness for the defense. Apparently, Waldorf argues that Rizzo lacked sufficient qualifications to testify as an expert witness in the field of vocational rehabilitation. He also argues

that some of Rizzo's testimony was outside his expertise and prejudicial.

On the stand, Rizzo stated that he is "an employment development specialist and business development specialist for the State of New Jersey." T6.15:20–21. He has a master's degree in sociology and social organization. From 1973 to 1976, he worked as a social worker, helping handicapped persons find employment. He also worked to help people who were being deinstitutionalized under a state program. In 1980, he started a non-profit corporation to assist people with disabilities to obtain community services. Later, he did social work with severely handicapped individuals. In 1990 of 1991, he began work with the Developmental Disabilities Counsel, starting as a contract manager. In the past three years or so, he has administered a non-profit disability loan fund pool which enables people with disabilities in New Jersey to start their own businesses.

■■■ In examining whether the Court properly qualified Rizzo as an expert, the Court looks first to Rule 702 of the Federal Rules of Evidence. This rule states that [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. Fed.R.Evid. 702. Rule 702 has two requirements. First, a witness offered to testify to specialized knowledge must be an expert. This requirement is read liberally. *See In re Paoli Railroad Yard PCB Litigation,* 35 F.3d 717, 741 (3d Cir.1994). A broad range of knowledge, skills, and training qualify an expert as such. Courts in this circuit "have eschewed imposing overly rigorous requirements of expertise and have been satisfied with more generalized qualifications." *Id.* A court may not exclude expert testimony just because an expert lacks the degree or training which the district court thinks most appropriate. *Id.*

In *Hammond v. International Harvester Co.,* 691 F.2d 646, 652–53 (3d Cir.1982), for example, the court held that an engineer, whose only qualifications were sales experi-ence in the field of automotive and agricultural equipment and teaching high school automobile repair, could still testify in a products liability action involving tractors. In *Knight v. Otis Elevator Co.,* 596 F.2d 84, 87–88 (3d Cir.1979), the court held that an expert could testify that unguarded elevator buttons constituted a design defect despite the expert's lack of specific background in design and manufacture of elevators.

The Court finds that it properly qualified Rizzo as an expert on vocational rehabilitation. While his formal credentials may be a little thin, he certainly had sufficient substantive qualifications to be considered an expert under the liberal standard of Rule 702.

The second requirement of Rule 702 is that the expert must testify to specialized knowledge that will assist the trier of fact. The Supreme Court recently dealt with the implications of this requirement in *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Essentially, the Court found that an expert's testimony is admissible so long as the process or technique she uses in formulating her opinion is reliable. *Id.* at ——, 113 S.Ct. at 2794–95. In addition, the proffered connection between the research to be presented must "fit" with the particular disputed factual issues in the case. *Id.* at ——, 113 S.Ct. at 2795–96.

To prove the reliability of Rizzo's opinions, the Borough did not need to demonstrate by a preponderance of evidence that his opinions were correct, but, rather, by a preponderance of evidence, that such opinions were reliable. Under *Daubert,* the Court should find an expert opinion reliable under Rule 702 if it is simply based on "good grounds," that is, if it is based on the methods and procedures of science. Even if a judge considers an expert's opinion to be incorrect, the judge may still believe that the expert has good grounds to hold the opinion. "The focus ... must be solely on principles and methodology, not on the conclusions they generate." *Id.* at ——, 113 S.Ct. at 2797.

In this regard, Waldorf specifically challenges two of Rizzo's opinions: 1) his chart of various jobs Waldorf might obtain, including

possible salary ranges and 2) his statements about rehabilitation technology in Florida. With regard to the chart, the information Rizzo presented seems clearly derived from his own experience in the field of vocational rehabilitation and from recognized sources with which Rizzo would be expected to be familiar. Rizzo has significant background in finding employment for quadriplegics and other handicapped individuals. He would be expected to know what types of jobs they could do and how much they might earn. In addition, Rizzo apparently relied on appropriate sources such as the New Jersey Job Listing Book to glean the information which he presented to the jury. While the Court found some of the data Rizzo presented faintly absurd, at least as applied to someone in Waldorf's situation, the Court finds that Rizzo had good grounds for his opinions. In other words, it determines that Rizzo's opinions are reliable and "fit" the contested facts at issue in the case.

With regard to the Florida rehabilitation technology, the Court finds this argument without merit. Rizzo clearly had good grounds for his opinion here.

In short, the Court determines that the Borough met the second requirement of Rule 702, as explained by *Daubert.* It finds that those parts of Rizzo's testimony to which Waldorf objects are clearly admissible. Therefore, the Court rejects Waldorf's argument that the decision to permit Rizzo to testify as an expert was erroneous and unfairly prejudicial. Accordingly, the motion for a new trial on this ground is denied.

### b. *The Borough's alleged misuse of Pascuitti's testimony*

One of the Borough's experts, James Pascuitti, was a quadriplegic. Waldorf insists that the Borough repeatedly compared the life of Pascuitti to the plaintiff, thereby trying to cast Waldorf in an unflattering light. This, the plaintiff claims, confused the issues and unfairly prejudiced him.

Waldorf concedes that this Court admonished the Borough not to do this, but evidently maintains that the Borough still "took every opportunity to" do so. Pl.'s Br. at 28. Waldorf cites two examples: 1) the Borough asked Pascuitti on redirect about the wedding band he wore on his finger and 2) the Borough stated in its summation that Pascuitti enrolled in college the year after his injury and then completed college in four years.

With regard to the band, the following colloquy occurred:

Q. ... [W]hat is that ring you are wearing on your left hand

A. Wedding band.

The Court: What?

Mr. Amdur: Wedding band.

T6.170:4–8. After this exchange, the Court promptly issued a curative instruction. It said: "I ask the jury to disregard whether he wears a wedding band is immaterial to the case ... I specifically instruct you whether this witness wears a wedding bank in wholly irrelevant to the issues in this case." T6.170:14–20. While charging the jury, the Court again instructed the jury to disregard the reference to the band. It said "two things I told you disregard, there was a reference made by the plaintiff to his desiring to be ... a lawyer, and the other thing was the reference by the expert of the defendant's [sic] to his wedding band. Remember that? You're not to use either in deciding any issue in this case." T7.746–11. Given these instructions, it is difficult to see how the jury could have been confused about whether to consider the wedding band as evidence, or how Waldorf could have been prejudiced by this issue.

With regard to the Borough's reference to Pascuitti's college enrollment, Waldorf did not object to these statements at trial. It is well-settled that a party who fails to object to errors or to raise issues at trial waives the right to complain on appeal. *Fleck,* 981 F.2d at 116. Even if Waldorf had objected, though, the Court would still have permitted these statements. The Borough was simply restating information that had already been presented to the jury.

Hence, the Court denies Waldorf's motion for a new trial on this ground.

432

### c. *The Borough's closing remarks regarding occupational therapy*

Waldorf attests that during closing arguments, the Borough argued that he was entitled to free job training for the rest of his life, which it termed "occupational therapy." T8.24. Earlier in the trial, however, Dr. Ragnarsson had defined occupational therapy differently. He had noted that "occupational therapy" does not refer to "getting back into an occupation." T4.82–83. Rather, it refers to "extremities skills, like hand function and dexterity and training in what we call activities of daily living." Id. Waldorf argues that the Borough's misuse of the term "occupational therapy" misled the jury, leading them to give Waldorf a smaller amount of economic damages than it might otherwise.

The Borough essentially concedes that it misused the term "occupational therapy." However, it notes that there was evidence that Waldorf had certain free vocational services available to him both in Florida (where he now lives) and New Jersey. Hence, it argues that the "thrust" of its comment about free job training was correct.

While the Court agrees that the Borough's use of "occupational therapy" was sloppy and incorrect, it does not think that such use unduly prejudiced the jury or ignited its passions. *See Smith v. National R.R. Passenger Corp.*, 856 F.2d 467, 470 (2d Cir.1988). Certainly, it was hardly shocking to the conscience or a miscarriage of justice. It does not warrant a new trial in this case.

### B. *Additur*

While New Jersey and some other states permit additur in cases where the amount of damages is disputed, federal practice does not. As the Supreme Court has made clear, additur is prohibited in the federal courts by the Seventh Amendment's guarantee of a jury trial. *Dimick v. Schiedt*, 293 U.S. 474, 486–87, 55 S.Ct. 296, 301, 79 L.Ed. 603 (1935).

To avoid this constitutional impediment, Waldorf seeks to waive his Seventh Amendment right to a jury trial, a right he originally exercised when he filed his complaint. The defendants, though, do not consent to such waiver. See Fed.R.Civ.P. 38(d). And permitting additur would impair the defendants' right to a jury trial. *See Estes v. Southern Pac. Trans. Co.*, 598 F.2d 1195, 1199 (10th Cir.1979). The attempted "waiver" by the plaintiff is an exercise in practical futility.

The motion for additur must be denied.

### IV. *Conclusion*

For the foregoing reasons, the Court finds that the jury's verdict of $3,086,500, including $2,500,000 for pain and suffering and $586,500 for past and future lost earnings, was not inadequate or against the weight of the evidence. Hence, the Court **denies** Waldorf's motion for a new trial. In addition, the Court determines that additur will not be permitted here. Therefore, it **denies** Waldorf's motion in the alternative for additur.

**SO ORDERED.**